**The People of the State of Illinois, Plaintiff-Appellee, v. Bernard Blunt, Defendant-Appellant.**

**Gen. No. 10,645.**

Fourth District.

December 21, 1965.

Dwight H. Doss, of Monticello, for appellant.

Ray Moss, Special State's Attorney, of Clinton, for appellee.

SMITH, J.

The sole issue in this case is whether the 23-year-old prosecuting witness was so mentally deficient that she could not give effective consent to an act of intercourse. The jury found the defendant guilty of rape. He appeals from a denial of his motion for new trial and the resultant sentence to the penitentiary for a term of 3 to 5 years.

Ill Rev Stats 1963, c 38, ¶ 11–1, so far as here pertinent, reads:

"Intercourse by force and against her will includes, but is not limited to, any intercourse which occurs in the following situations:

 (1) . . .

 (2) Where the female is so mentally deranged or deficient that she cannot give effective consent to intercourse."

Bernard Blunt was 25—Joy Bates was 23—neither was married. They met for the first time that day, entered a motel in Clinton about 6 p. m. as friends, stayed the night, had intercourse twice and parted on a friendly basis the next morning. Their testimony as to the situational events might well have been carbon copies. It is not in dispute. The record is utterly devoid of any evidence of force, resistance, outcry, outrages or complaint on the part of Joy. The psychologists for both sides affirmatively state that Joy was not mentally deranged. On its face, this record shows two adults engaging in the time-honored pleasures of the flesh, without a solitary discordant note and with apparent mutual consent and satisfaction. Indeed the People do not claim otherwise. Their position is that Joy was so mentally deficient that she could not give effective consent and thus the pleasant sensuality of the night is converted by the statute into rape.

Witness Jones had for four years been Supervisor of Services for the Mentally Handicapped and taught in the Champaign school system for 5 years prior thereto. He had known Joy for 9 years, gave her an IQ of 78, said she was not mentally deranged, was without psychosis, was mentally deficient and declined an opinion as to whether Joy was so mentally deficient that she could not distinguish between right and wrong.

Witness Wollersheim was a psychologist teaching at the University of Illinois and working on her doctorate.

She gave Joy an IQ of 77, considered her a borderline case and would not say that she was so mentally deficient that she could not distinguish between right and wrong. She felt that Joy could have a sense of guilt in some areas.

Witness Gromoll was a Doctor of Psychology, had 4 years experience with the Veterans Administration, had 3 years with the Macon County Mental Health Clinic and was head of the Department of Psychology at Millikin University. He gave her a verbal IQ of 68, a performance IQ of 78, and a full scale IQ of 71. He found she was not mentally deranged or psychotic, that she knew the act of intercourse was wrong when she did it, but did it anyhow, that there was no question about her feeling badly and feeling guilty, that she said she wished it hadn't happened and didn't think it would happen again. In his opinion, she was mentally deficient, but capable of giving effective consent to an act of intercourse. He further stated that others might disagree on this matter and it was purely a matter of opinion.

Joy's mother testified that she had always been slow to learn, had been in special education classes, graduated from high school at the age of 18 with her senior class in four years and was issued a certificate of completion. As abstracted she testified that Joy "traveled alone by bus to visit her friend, Joan, in Decatur. She can cook and prepare a full meal, cleans the house, does domestic work, does quite a bit of her own personal shopping, and goes out once a week with 5 or 6 girl friends, attends movies, baby-sits, and I could always depend upon her, and I have explained the facts of life to her, she knows what sexual intercourse is, but I don't think she had ever had sexual intercourse before. Joy has been visiting in Decatur at least 4 or 5 times." She further stated "that she had nothing to drink, wasn't mistreated and was not unconscious nor drugged. I did give her sex education

and she does know what sexual intercourse is, and she knew what it meant on July 11, 1964. I had told her there was a possibility of contracting a venereal disease, of becoming pregnant by reason of sexual intercourse, and she knew what being pregnant meant. Since July 11th Joy has a feeling of being ashamed and unclean, and had the feeling of committing adultery because she goes to Church and understands the Ten Commandments."

The record shows that Joy visited with her friend, Joan, in Decatur for several days before the occurrence; that Joan was then pregnant and was unmarried and was delivered of a woods colt shortly before the trial; that they returned from a date with a couple of boys about 5 a. m. in the morning and these boys offered to take Joy back to her home in Champaign; that instead they went to Carter's Lake near Clinton and Joy had intercourse there with one Ronnie Provin; that they went to a place on Salt Creek called Possum Hollow where the defendant joined them; that after one act of intercourse at the motel, defendant went to get some beer and while gone Joy had a second act of intercourse with Ronnie; that Ronnie then left and Joy and defendant had a second act of intercourse and, as Joy testified, she turned over, went to sleep, and awakened about 6 o'clock, defendant awakened, said "Good Morning, Doll", took a shower, said he had to go to work and gave her a dollar for breakfast. Joy did not become pregnant as a result of the day's events.

Joy testified on behalf of the People. It is suggested that it is impossible to reflect in the printed record her appearance, demeanor and intelligence and the difficulty both counsel had in eliciting her answers. This is, of course, true. The record does show a failure to answer some questions, that at one point the witness cried and her cross-examination resulted largely in monosyllabic

answers. Joy had a high palate with a resultant speech difficulty but could be readily understood. As against this circumstance, we necessarily weigh the testimony of her mother, the psychologists and the others who observed and conversed with her under more relaxed circumstances. Joy herself testified largely by way of yes or no answers to direct and specific questions to the following.

> "I had intercourse with Bernard Blunt twice on the evening of July 11, 1964, and he was not cruel to me at any time and was always kind and he did not hurt me in any way. I have had conversations with my mother with respect to what an act of intercourse is and I know and understand that you might contact a venereal disease if you have intercourse and that it is possible to become pregnant. I enjoyed intercourse with Bernard Blunt and he did not make any profane arguments or nasty remarks to me at any time.

> ". . . I understand that is an act of intercourse, and I think it was wrong to have committed an act of intercourse with Bernard Blunt and I am ashamed of it and sorry for it and feel guilty by reason of it, and I do not want Bernard Blunt prosecuted for having committed an act of intercourse with me or have him brought into Court. What he was doing with me was agreeable to me. I am not now pregnant. I understand what pregnancy is, and I know what menstrual periods are and I have menstrual periods and have had menstrual periods since July 11, 1964. If I were with the defendant or the other boys I had mentioned again I would not commit an act of intercourse with them."

The deputy sheriff who interviewed her during the morning after she left the motel stated:

". . . Joy did say she didn't want to face the boys again, that she was going to break her leg or run away from home so she wouldn't have to face the boys. I think she might have had a guilty feeling or possibly just her own personal feeling that she didn't want to face the boys."

In our judgment our inability to see and hear Joy on the witness stand does not absolve us from our obligation to carefully scrutinize the evidence. People v. Faulisi, 25 Ill2d 457, 185 NE2d 211; People v. Qualls, 21 Ill2d 252, 171 NE2d 612. This is even more impelling as we deal with a new statute which gives new legislative impact to the words "by force and against her will." The use of the word "so" in the statute assumes proportions beyond its size. Mere mental derangement or mental deficiency is not enough. Its thrust must be of sufficient magnitude to throttle effective consent. To what does the term "mentally deficient" relate? Does it imply the lack of mental capacity and training to understand calculus, the provisions of the Internal Revenue Code or the doctrine of dependent relative revocation in wills? We think not. Is the mental deficiency equated with the inability to pursue ordinary educational standards? If so, our inquiry is at an end, for Joy's schooling throughout was in special educational classes and she graduated from high school in special education. Does it mean the inability to distinguish between right and wrong in moral areas? One psychologist refused to express an opinion; another "would not say that she is so mentally deficient that she could not distinguish between right and wrong"; and the third felt that she could so distinguish. Joy's own testimony suggests that

she could so distinguish. Does it mean the inability to understand and comprehend the act of sexual intercourse, its moral aspects and the evil consequences which may flow from it? Again this record establishes such comprehension. The girl friend with whom she visited certainly had some information on the subject and was Exhibit No. 1 as to its consequences. We would be naive to assume that they did not discuss it.

In other jurisdictions where punishment is imposed upon those having sexual intercourse with females who through unsoundness of mind are incapable of effective consent, the capacity to consent "presupposes an intelligence capable of understanding the act, its nature and possible consequences." 44 Am Jur Rape, § 10, Ann Cas 1912B 1050. We think this record attributes to Joy that intelligence. The bizarre events of this record cannot be equated with Joy's lack of knowledge of the nature of the act nor of its moral reprehensibility nor of the possible fruits of its enjoyment. Morally distasteful as it is, it is not within the proscription of criminal sanctions under our Criminal Code relating to forcible rape. Accordingly, the judgment of the Circuit Court of DeWitt County must be and it is reversed.

Reversed.

TRAPP, P. J. and CRAVEN, J., concur.