# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Lloyd*, 2011 IL App (4th) 100094

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRY LLOYD, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-10-0094 |
| Argued | June 7, 2011 |
| Filed | November 16, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction and sentence on the first count of an indictment charging seven counts of criminal sexual assault was reversed on the ground that the evidence of intrusion was not clear and the cause was remanded for a new trial on that count, but the convictions on the six other counts were affirmed where the evidence was sufficient to prove beyond a reasonable doubt that defendant knew the 13-year-old victim was unable to give consent to defendant's conduct. |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 09-CF-16; the Hon. Charles G. Reynard, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded with directions. |

Counsel on
Appeal

Michael J. Pelletier, Karen Munoz, and Ryan R. Wilson (argued), all of State Appellate Defender's Office, of Springfield, for appellant.

William A. Yoder, State's Attorney of Bloomington (Patrick Delfino, Robert J. Biderman and Luke McNeill (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE TURNER delivered the judgment of the court, with opinion.

Justice Pope concurred in the judgment and opinion.

Justice Steigmann dissented, with opinion.

**OPINION**

¶ 1      In January 2009, a grand jury indicted defendant, Terry Lloyd, with seven counts of criminal sexual assault under section 12-13(a)(2) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/12-13(a)(2) (West 2008)). Following a July 2009 trial, a jury found defendant guilty of all seven counts. Defendant filed a motion for a new trial. At a joint November 2009 hearing, the McLean County circuit court denied defendant's posttrial motion and sentenced him to an aggregate 44 years in prison. Defendant filed a motion to reconsider his sentence, which the court denied in January 2010.

¶ 2      Defendant appeals his conviction, asserting (1) the State's evidence is insufficient to prove beyond a reasonable doubt defendant knew the victim, P.V., was unable to understand the nature of the charged act or give knowing consent to those acts, and (2) his convictions on four of the seven counts must be vacated where the acts pleaded in those counts do not constitute "sexual penetration" as defined for the jury. We affirm in part, reverse in part, and remand the cause with directions.

¶ 3                          I. BACKGROUND

¶ 4                       A. The State's Charges

¶ 5      The grand jury's seven indictments all asserted defendant committed criminal sexual assault under section 12-13(a)(2) of the Criminal Code (720 ILCS 5/12-13(a)(2) (West 2008)), which is violated when a person "commits an act of sexual penetration and the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent." The indictments alleged the acts were committed between September 1, 2008, and January 7, 2009, and stated P.V. was both "unable to understand the nature of the act or give knowing consent." Additionally, counts I, III, V, and VII alleged the penetration involved defendant's hand and P.V.'s vagina; and counts II, IV, and VI alleged

the penetration involved defendant's mouth and P.V.'s vagina.

¶ 6                                B. Trial Evidence

¶ 7       The State presented the following evidence in support of its charges at defendant's July 2009 trial.

¶ 8       P.V., born February 28, 1995, testified that, when she was 13 years old, she and her mother returned home to find defendant's van parked in their driveway. Defendant was in the van with P.V.'s aunt, Brenda Phelps. P.V. had known defendant her whole life as he was a long-time family friend. P.V. got into the van and sat behind Brenda. Shortly thereafter, defendant reclined his seat and began rubbing P.V.'s leg and "private part." P.V. moved defendant's hand once, but when he put his hand back on her leg, she decided to "just let it be." Brenda then exited the van. (Brenda acknowledged during her testimony that she had a conviction for "permitting the sexual abuse of a minor" in McLean County case No. 97-CF-448.)

¶ 9       Defendant told P.V. she was "beautiful" and "sexy." P.V. responded by laughing, thinking defendant was joking. Defendant resumed rubbing P.V.'s leg and rubbing her "private part" over her underwear. Defendant then placed his hand into P.V.'s underwear. He touched the part of her private area that "has the hole" and moved his finger up and down in that area. Defendant stopped touching her when she said "[s]omebody's coming" after a light came on in the house.

¶ 10      A week or two later, defendant was at P.V.'s house, and P.V. asked Brenda and defendant if she could listen to music in defendant's van. Defendant gave her the keys to the van, and she alone went out to the van. Shortly thereafter, defendant came out and joined P.V. in the van. Defendant asked P.V. whether she enjoyed herself the "last time" and told her that she was beautiful. Defendant then began touching P.V.'s leg and clothing above what P.V. described as her "private." Defendant then told P.V. that she had "too much clothes on." P.V., thinking defendant wanted to do "the same thing that he did the last time," walked into the house, changed clothes, and returned to the van. Defendant did not have to ask P.V. to take off her clothes because P.V. "already kinda [*sic*] knew what [she] was supposed to do." P.V. explained the reason she returned to the van, as follows:

> "[W]ell, in a sense, I was scared, but then, like, I didn't really–I don't know. I kind of thought it was, like, right at the time, because, like, I don't really talk or hang around people that are my age. I usually hang out with my sister's friends, and my sister's 16 now, but she was 15 at the time. They're always talking about, like, the stuff that they've done and stuff, and so I just kind of figured that maybe that's what they were talking about, so I kind of–I guess in a way, I went along with it 'cause I thought that I was supposed to do, like, the same thing, because I didn't really, like, express it, I guess, in a way."

¶ 11      P.V. moved to the back of the van and pulled her sweatpants down. Defendant began rubbing her "private part on top of [her] underwear." After that, he placed his hand under her underwear and "put his fingers inside of [her] private." At first, it was just one finger, but later it was two fingers. Defendant moved his hand under P.V.'s sports bra and then asked

P.V. if he could "taste it." P.V. responded, " 'I don't know,' " but then "agreed to it." Defendant put his tongue on P.V.'s vagina. Defendant's cellular telephone rang, and defendant stopped. Before P.V. got out of the van, defendant told her not to tell anyone. He also said "he'd get, like, 45 to life years." P.V. promised that she would not tell because she did not "want to get anybody in trouble."

¶ 12 Approximately two weeks later, P.V. was again listening to music in defendant's van when defendant came out to join her. Defendant asked P.V. if she "wanted to do it again." P.V. initially said no. However, defendant persisted and P.V. eventually agreed, telling defendant it was going to be the last time. Defendant began rubbing P.V.'s leg. Because P.V. was in a seat that could be seen through the window, she moved to the rear row of seats in the van. P.V. helped defendant pull her pants down. Defendant "put his fingers in [her] private, and then he had put his tongue on my private." When defendant asked P.V. if she had ever " 'kissed a dick,' " P.V. responded she had not and did not want to. Defendant's cellular telephone rang, and she got out of the van.

¶ 13 That same day, defendant called P.V. on her cellular telephone. He began the conversation by asking where she was, if anyone was around, and whether she could talk. Defendant then asked why she was acting weird around him. A few days later, defendant was at her house. After he left, defendant called P.V. on her cellular telephone to ask why she was acting weird again. Defendant again had started the conversation by asking where she was and if she could talk.

¶ 14 About a week later, defendant stopped at P.V.'s house, and Brenda asked defendant to take P.V. to the gas station to buy some potato chips. P.V. got into defendant's van. Defendant drove away but did not go directly to the gas station. Instead, he drove out of town for what "felt like 30 minutes." When defendant stopped the van, he told P.V. to get into the back of the van. Defendant pulled P.V.'s pants down and began rubbing her "private" and performing oral sex on her. Defendant put two of his fingers "inside of [her] private" and stated it "seemed like [she] could take *** good dick, or big dick."

¶ 15 After that defendant asked P.V. "if he could put his private inside of [hers]." Concerned that defendant was actually going to try to penetrate her with his penis, P.V. told defendant she did not want him to do that. Defendant then proceeded to perform oral sex on P.V. for another 10 minutes. At that point, P.V. told defendant she wanted defendant to stop, explaining Brenda would wonder where they were. Defendant stopped, and they drove to the gas station before returning to P.V.'s home.

¶ 16 A few days later, P.V. told her sister about what defendant had done. The next day, P.V. told her mother, who contacted the police.

¶ 17 On cross-examination, P.V. testified she had attended sexual-education classes since sixth grade, where she received information about "good touches" and "bad touches." P.V. "wanted to have the experience, just not with [defendant]."

¶ 18 Detective Michael Burns testified he met with P.V. at her mother's request. After speaking to P.V., Burns met with defendant, whose birth date is February 28, 1966 (making him 42 years old at the time of the offenses). Defendant told Burns he listened to music in the van with P.V. but denied ever being alone with P.V. in the van or anywhere else.

Defendant also denied ever calling P.V. on her cellular telephone. However, telephone records admitted into evidence at trial showed someone using defendant's cellular telephone had called P.V.'s cellular telephone twice.

¶ 19    Brenda testified she lived with P.V. and P.V.'s mother, Brenda's sister, when defendant was taking advantage of P.V. At the time of trial, Brenda was married to defendant's half-brother. Brenda recalled several occasions in which defendant had been alone with P.V., including the time P.V. left with defendant to retrieve the potato chips from the gas station. Defendant and P.V. were gone "longer than what [she] expected [them] to be."

¶ 20    Defendant chose not to present any evidence in his defense.

¶ 21    After the case went to deliberations, the jury asked the following two questions:

"(1) Does contact with the sex organ through clothing constitute sexual penetration?

(2) How much of the body (the pubic area) is considered part of the sex organ[?]"

In response to the questions, the trial court gave the jury the following remarks:

"In response to Question #1, be advised you have the instructions of law concerning the definition of sexual penetration. No further definition can be provided to you.

In response to Question #2, you are further instructed: The female 'sex organ' is not limited to the vagina but also includes the labia majora and labia minora, the outer and inner folds of skin of the external genital organs."

The court also gave some citations for its answer to the second question.

¶ 22                    C. The Jury's Verdict and Defendant's Sentence

¶ 23    On the aforementioned evidence, the jury convicted defendant of all seven counts of criminal sexual assault. In November 2009, the trial court sentenced defendant to (1) five years in prison on counts I and II, (2) six years in prison on counts III and IV, (3) seven years in prison on counts V and VI, and (4) eight years in prison on count VII. The court ordered all of the sentences to be served consecutively, for an aggregate sentence of 44 years in prison. Defendant filed a motion to reconsider his sentence, which the court denied on January 5, 2010.

¶ 24    On February 1, 2010, defendant filed a notice of appeal in compliance with Illinois Supreme Court Rule 606 (eff. Mar. 20, 2009). Thus, this court has jurisdiction under Illinois Supreme Court Rule 603 (eff. July 1, 1971).

¶ 25                              II. ANALYSIS
¶ 26                       A. Sufficiency of the Evidence
¶ 27    Defendant first asserts the State failed to present any evidence establishing defendant knew P.V. was unable to understand the nature of the charged acts or give knowing consent to those acts as required by section 12-13(a)(2) of the Criminal Code. The State argues P.V. was unable to understand the nature of the charges and give knowing consent due to her youth and defendant knew that.

¶ 28    When presented with a challenge to the sufficiency of the evidence, a reviewing court's

function is not to retry the defendant. *People v. Givens*, 237 Ill. 2d 311, 334, 934 N.E.2d 470, 484 (2010). Rather, we consider " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Davison*, 233 Ill. 2d 30, 43, 906 N.E.2d 545, 553 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under that standard, a reviewing court must draw all reasonable inferences from the record in the prosecution's favor. *Davison*, 233 Ill. 2d at 43, 906 N.E.2d at 553. Additionally, we note a reviewing court will not overturn a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Givens*, 237 Ill. 2d at 334, 934 N.E.2d at 484.

¶ 29     Here, the grand jury charged defendant with criminal sexual assault under section 12-13(a)(2) of the Criminal Code, which states, in pertinent part, as follows:

"(a) The accused commits criminal sexual assault if he or she:

\*\*\*

(2) commits an act of sexual penetration and the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent[.]" 720 ILCS 5/12-13(a)(2) (West 2008).

In *People v. Whitten*, 269 Ill. App. 3d 1037, 1042-43, 647 N.E.2d 1062, 1066 (1995), the Fifth District explained the "accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent" language of section 12-13(a)(2) that is at issue in this appeal. The *Whitten* court stated the following:

"The crime of criminal sexual assault is committed by the wrongful act of the accused, not the inability of the victim. There is nothing in the phrase 'unable to give knowing consent' that indicates that this phrase should be limited to those situations where a victim's ability to understand is in question. The legislature clearly indicated in section 12-13(a)(2) that there are two different ways to commit the crime; the first, of course, is to knowingly have sexual relations with someone who is unable to understand the nature of the act, while the second method is to knowingly have sexual relations with someone who, *for any reason*, is unable to give knowing consent. Courts should not automatically intertwine these two ways to violate the statute, so that we are left with only one type of victim, the severely developmentally disabled person. We should, therefore, consider all the evidence before the jury, including the accused's perspective as to what he knew and when he knew it, in assessing the question of complainant's consent." (Emphasis added.) *Whitten*, 269 Ill. App. 3d at 1042-43, 647 N.E.2d at 1066.

¶ 30     Defendant cites the Second District's *People v. Fisher*, 281 Ill. App. 3d 395, 403, 667 N.E.2d 142, 147 (1996), where that court stated section 12-13(a)(2) "applies to situations where an otherwise normally competent person is rendered temporarily unable to give knowing consent." Similarly, the dissent asserts section 12-13(a)(2) is limited to the victim's inability to consent based on a mental condition. *Infra* ¶ 57. We disagree this section is limited to only those situations. Section 12-13(a)(2) places no limitation on the reason for the victim's inability to understand the act or give knowing consent. If the legislature intended to limit the reasons to temporary conditions or mental conditions, it would have so

noted. It is not our job to create limitations. See *People v. Woodard*, 175 Ill. 2d 435, 443, 677 N.E.2d 935, 939 (1997) ("Where an enactment is clear and unambiguous, the court is not free to depart from the plain language and meaning of the statute by reading into it exceptions, limitations, or conditions that the legislature did not express ***."). As Justice Scalia has stated, "The only sure indication of what Congress intended is what Congress enacted ***." *Zuni Public School District No. 89 v. Department of Education*, 550 U.S. 81, 122 (2007) (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

¶ 31      In this case, the issue on appeal can be addressed under the second method of proving the offense, "knowingly have sexual relations with someone who, *for any reason*, is unable to give knowing consent." (Emphasis added.) *Whitten*, 269 Ill. App. 3d at 1042, 647 N.E.2d at 1066. On appeal and at trial, the State asserted P.V. was unable to give knowing consent based on her young age. The concept that a person must attain a certain age to be able to give consent to sexual activities has deep legal roots. The American legal system adopted it from the English common law, which had codified it in 1275. Michelle Oberman, *Turning Girls Into Women: Re-evaluating Modern Statutory Rape Law*, 8 DePaul J. Health Care L. 109, 119 (2004). The reasoning behind an age of consent is that young people lack maturity in judgment and the ability to comprehend the consequences of such activity. See *Addison v. People*, 193 Ill. 405, 417-18, 62 N.E. 235, 238 (1901) (*per curiam*); see also Russell L. Christopher & Kathryn H. Christopher, *Adult Impersonation: Rape by Fraud as a Defense to Statutory Rape*, 101 Nw. U. L. Rev. 75, 111-12 (2007). Thus, "[t]he age of consent fixed by a state represents a legislative judgment about the maturity of girls in matters of sex." *Beul v. ASSE International, Inc.*, 233 F.3d 441, 450 (7th Cir. 2000). The Illinois legislature has enacted several age-based criminal statutes addressing the offender's age, the victim's age, and the type of conduct, and those provisions show the age of consent in Illinois is generally 17 (720 ILCS 5/12-15(c) (West 2008)) but, in a few instances, it is 18 (see, *e.g.*, 720 ILCS 5/12-13(a)(3) (West 2008)). See *Doe v. Oberweis Dairy*, 456 F.3d 704, 707 (7th Cir. 2006) (*en banc*).

¶ 32      The facts of this case highlight the reason behind the existence of the age of consent. While P.V. was curious about sexual activities and wanted to have the experiences her sister and her sister's friends had, she felt weird and scared and did not want the experience to be with defendant. P.V. also testified she thought that she was supposed to do those things based on the conversations she heard between her sister and her sister's friends. Her explanation of why she changed her clothes at defendant's request shows a confused and inexperienced young teenager. P.V.'s immature thought process is highlighted by the fact she kept thinking it would not happen again. Moreover, the trial evidence showed on a couple of occasions she would initially tell defendant no to the activity he wanted to do but then would eventually allow him to do it after he persisted. Defendant, who was almost 30 years older than P.V., was the one that started all of the advances.

¶ 33      The fact the legislature has enacted some age-based statutes eliminating the term "consent" does not mean the legislature sought to exclude the inability to consent based on age from section 12-13(a)(2). As stated, section 12-13(a)(2) contains no such limiting language. Moreover, section 12-13(a)(2) requires the State to prove the defendant knew the person was unable to consent, not simply the victim's age. With the age-based crimes, the

State does not have to prove that fact. Moreover, because the State has to prove the accused knew the victim was unable to consent, it would be highly unlikely any sexual contact between two similarly aged teenagers under 17 or sex with a person almost 17 would be punishable under section 12-13(a)(2). Thus, we disagree with any suggestion the inability to consent based on age is excluded from section 12-13(a)(2) because it would produce an illogical result. *Infra* ¶¶ 63-65.

¶ 34    As noted in *Whitten*, 269 Ill. App. 3d at 1042-43, 647 N.E.2d at 1066, the focus of our analysis is on what defendant knew. Contrary to any suggestion by the State, the mere fact P.V. was 13 alone is insufficient to prove "the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent." 720 ILCS 5/12-13(a)(2) (West 2008). Knowledge is usually established by circumstantial evidence. *People v. Weiss*, 263 Ill. App. 3d 725, 731, 635 N.E.2d 635, 639 (1994). "The State must present sufficient evidence from which an inference of knowledge can be made, and any inference must be based on established facts and not pyramided on intervening inferences." *Weiss*, 263 Ill. App. 3d at 731, 635 N.E.2d at 639. Defendant had known P.V. her entire life and had the same birth date as hers, about which they often joked. Thus, defendant would have known P.V. was in her early teens, well below the age of consent.

¶ 35    The State's evidence also shows defendant knew P.V. could not knowingly consent due to her young age. Before P.V. left the van after the second incident, defendant told P.V. she could not tell anyone because he would get "45 to life." After the third and fourth incidents, defendant again told P.V. she could not tell anyone. Defendant also stated on three occasions P.V. made him nervous because he thought she was going to tell on him. When defendant called P.V. on her cellular telephone, defendant began the conversation by asking if anyone was around and if she was able to talk. Such actions again indicate he had knowledge P.V. could not consent to the activities in which they were engaging. Additionally, when confronted by Officer Burns, defendant denied calling P.V. and denied being alone with her in the van.

¶ 36    In addition to the testimony about defendant's statements, the jury viewed and heard P.V. while she testified in court at the July 2009 trial. The jury had the opportunity to assess P.V.'s personal characteristics, including her maturity level, physical characteristics, and emotional and mental strength. Such considerations would factor into her lack of ability to consent due to her youth and defendant's knowledge of her inability to consent. Moreover, we note that, as defendant had known P.V. all of her life, he was positioned to take advantage of her naiveté as she was coming into her teen years. Based on its observations and subsequent assessments of P.V., the jury could reasonably infer P.V. was unable to give consent to this older lifelong family friend. A cold record does not give us the opportunity to make those observations and subsequent assessments, and that is why we give great deference to the trier of fact's judgment.

¶ 37    Accordingly, we find the State presented more than ample evidence to prove beyond a reasonable doubt defendant knew P.V. was unable to give consent.

¶ 38                                    B. Jury Instruction

¶ 39        Defendant asserts his convictions for criminal sexual assault based on his actions with his fingers must be vacated based on the definition of "sexual penetration" provided the jury. Defendant acknowledges he failed to preserve this error in the trial court and requests that we review the issue under the plain-error doctrine (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)). The State concedes the jury was provided the wrong jury instruction defining "sexual penetration" but argues the error did not rise to the level of plain error.

¶ 40        The plain-error doctrine permits a reviewing court to consider unpreserved error under the following two scenarios:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1058 (2010).

Since the State admits an error occurred, we begin our analysis by considering whether either of the two prongs of the plain-error doctrine has been satisfied. *Sargent*, 239 Ill. 2d at 189-90, 940 N.E.2d at 1059. Under both prongs, the defendant bears the burden of persuasion. *Sargent*, 239 Ill. 2d at 190, 940 N.E.2d at 1059.

¶ 41        Defendant contends the error was so serious that he was denied a fair trial. We begin by examining the error. The four convictions at issue are based on defendant committing an act of sexual penetration with P.V., involving his fingers and her vagina. Section 12-12(f) of the Criminal Code (720 ILCS 5/12-12(f) (West 2008)) defines "sexual penetration" and produces two broad categories of conduct. See *People v. Maggette*, 195 Ill. 2d 336, 346-47, 747 N.E.2d 339, 345 (2001). One category "includes any *contact* between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person." (Emphasis in original.) *Maggette*, 195 Ill. 2d at 347, 747 N.E.2d at 345. With this category, the term "object" does not include parts of the body. *Maggette*, 195 Ill. 2d at 350, 747 N.E.2d at 347. The second category "includes any *intrusion* of any part of the body of one person or of any animal or object into the sex organ or anus of another person." (Emphasis in original.) *Maggette*, 195 Ill. 2d at 347, 747 N.E.2d at 345. Illinois Pattern Jury Instructions, Criminal, No. 11.65E (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 11.65E) separates the definition of "sexual penetration" into the two aforementioned categories. In this case, at the State's request, the trial court gave only the first portion of IPI Criminal 4th No. 11.65E, which is the first or "contact" definition. Under that definition, defendant's finger cannot constitute an "object," and thus the State could not have proved sexual penetration by defendant's finger under that definition.

¶ 42        The State recognizes the second or "intrusion" definition should also have been given to the jury. However, it argues defendant was not prejudiced by the improper instruction and was not denied a fair trial. Specifically, it notes with the last three incidents, P.V. gave specific testimony of digital penetration, and as to the first incident, the evidence was sufficient for the jury to reasonably infer digital penetration took place.

¶ 43     Defendant notes the error with the jury instruction was compounded by the fact that, in its closing argument, the State improperly explained the "sexual penetration" definition by using the language of the contact clause instead of the intrusion clause. He also notes the trial court's definition of female sex organ in response to the jury's second question. Moreover, defendant disagrees with the State's assertion P.V.'s testimony showed digital penetration took place on all four occasions.

¶ 44     We agree with the State P.V.'s testimony clearly demonstrates defendant inserted his fingers into her vaginal opening during the second, third, and fourth incidents. With each incident, P.V. stated defendant put his fingers inside or in her "private." With the second and fourth incidents, P.V. explained it was not just one, but two fingers. Moreover, with the last incident, P.V. testified defendant stated she could take "good dick, or big dick" after his fingers were inside her "private." Such testimony is clear evidence of digital penetration unlike in *People v. James*, 331 Ill. App. 3d 1064, 1068, 773 N.E.2d 1176, 1180 (2002), where the victim testified the "defendant touched her 'in' her 'private part' " but did not explain what constituted her "private part." Since the uncontroverted evidence showed digital penetration, the result of defendant's trial would not have been different if the intrusion instruction would had been given. Accordingly, we find defendant has not shown plain error resulted from the erroneous jury instruction as to three of the four counts of criminal sexual assault based on defendant's actions with his fingers. See *People v. McNeal*, 405 Ill. App. 3d 647, 676, 952 N.E.2d 32, 45-46 (2010) (finding no plain error for an improper jury instruction where the evidence showed an intrusion and thus the outcome would have been the same if the proper instruction would have been given).

¶ 45     The evidence of intrusion with regard to the first incident is not as clear. As to that incident, P.V. testified defendant's finger touched "the part that has the hole" and his hand went up and down on the part of her "privates" that has a hole. As the State notes, "[a] jury may reasonably infer that an act of penetration occurred based on testimony that the defendant 'rubbed,' 'felt' or 'handled' the victim's vagina," unless the victim denied penetration occurred. *People v. Hillier*, 392 Ill. App. 3d 66, 69, 910 N.E.2d 181, 184 (2009). However, in this case, the jury twice received the wrong definition of "sexual penetration" that did not inform the jury an intrusion was required. Thus, while we find the jury could have found sexual penetration under the intrusion clause during the first incident, it is also reasonable a jury could have not found an intrusion based on P.V.'s testimony. Since the incorrect "sexual penetration" definition could have affected the outcome of defendant's trial on the count of criminal sexual assault based on the initial incident (presumedly count I), we find defendant has shown plain error as to that conviction. Accordingly, we reverse defendant's criminal-sexual-assault conviction and sentence for count I and remand for a new trial on that count. See *James*, 331 Ill. App. 3d at 1070, 773 N.E.2d at 1181.

¶ 46                                  III. CONCLUSION

¶ 47     For the reasons stated, we reverse defendant's criminal-sexual-assault conviction and sentence for count I, affirm the McLean County circuit court's judgement in all other respects, and remand for a new trial on count I. As part of our judgment, we award the State

its $75 statutory assessment against defendant as costs of this appeal.

¶ 48    Affirmed in part and reversed in part; cause remanded with directions.

¶ 49    JUSTICE STEIGMANN, specially concurring in part and dissenting in part:

¶ 50    Defendant engaged in felonious criminal conduct and deserves to be punished. Regrettably, the crimes charged were not the crimes he committed. Because the State's evidence completely fails to prove defendant guilty *of the crimes charged*, this court is duty-bound to reverse all of his convictions. Accordingly, I respectfully dissent.

¶ 51                          I. BACKGROUND
¶ 52                        A. The State's Charges
¶ 53    In January 2009, the State charged defendant with seven counts of criminal sexual assault pursuant to section 12-13(a)(2) of the Criminal Code (720 ILCS 5/12-13(a)(2) (West 2008)), which states that an individual commits criminal sexual assault when he commits an act of sexual penetration with a victim who he knows is unable to "understand the nature of the act" or "give knowing consent." These seven counts were the only charges against defendant. That means that in order to convict him of *anything*, the State needed to prove beyond a reasonable doubt that defendant committed an act of sexual penetration with P.V. and he knew that she was either (1) unable to understand the nature of the act or (2) was unable to give knowing consent.

¶ 54     B. The Term "Unable" Under Section 12-13(a)(2) of the Criminal Code
¶ 55    When analyzing section 12-13(a)(2) concerning whether a victim was unable to understand the nature of the act or was unable to give knowing consent, the question should be asked: Unable, *why*? There are two possible answers to that question, depending upon one's construction of the section. The first answer is because of the victim's mental condition; the second answer is because of the victim's legal condition.

¶ 56                    1. *The Victim's Mental Condition*
¶ 57    A review of the sections of the Criminal Code defining sex offenses makes clear that section 12-13(a)(2) is referring to the victim's mental condition. Thus, when properly understood, that section would read as follows: "(a) the accused commits criminal sexual assault if he or she *** (2) commits an act of sexual penetration and the accused knew that the victim *because of the victim's mental condition* was unable to understand the nature of the act or *because of the victim's mental condition* was unable to give knowing consent." This construction is consistent both with the plain language of the statute and how it has been applied since the section was added to the Criminal Code in 1984. The victims in cases involving section 12-13(a)(2) have been unable to understand the nature of the sexual acts or unable to consent because of their mental condition–that is, the victims typically were

-11-

either severely mentally handicapped or in such a drunken state as to be practically comatose. See, for example, *People v. Weiss*, 263 Ill. App. 3d 725, 635 N.E.2d 635 (1994) (victim was 34 years old and functioning at the level of a 4-year-old child); *People v. Barnslater*, 373 Ill. App. 3d 512, 869 N.E.2d 293 (2007) (victim was in a drunken stupor).

¶ 58                          2. *The Victim's Legal Condition*

¶ 59       The alternative construction of the statute would have it read as follows: "(a) The accused commits criminal sexual assault if he or she *** (2) commits an act of sexual penetration and the accused knew that the victim *because of the victim's legal condition* was unable to understand the nature of the act or *because of the victim's legal condition* was unable to give knowing consent." In this case, the "legal condition" is P.V.'s young age, which is the *sole* argument that the State has offered regarding the notion that she "could not consent" and defendant was aware of that fact. According to this argument, she could not consent because, being only 13 years old, the law would not recognize her consent.

¶ 60       This construction of the statute is based upon the victim's legal condition–namely, her age–and not based upon her acuity in any way. Under this analysis, she could be the most precocious, knowledgeable, and advanced 13-year-old one could imagine, but she would still be a victim (under section 12-13(a)(2)) who was unable to understand the nature of the act or was unable to give knowing consent.

¶ 61                  3. *The Consequences of the Majority Opinion*

¶ 62       Under this construction of the statute, P.V.'s "legal condition"–namely, her inability to give knowing consent because of her age–stems from either section 12-15(b), (c), 12-16(c), (d) or (f) of the Criminal Code. 720 ILCS 5/12-15(b), (c), 12-16(c), (d), (f) (West 2008). These are the five statutes that essentially constitute what used to be known as "statutory rape," meaning that a person engaging in an act of sexual penetration or sexual conduct with a victim who was under 17 years of age committed a criminal offense whether or not the victim was a willing participant. (Under sections 12-15(b) and (c), the crimes involved are misdemeanors, whereas under sections 12-16(c), (d), and (f), the crimes involved are probationable, Class 2 felonies.) However, if the "legal condition" because of the victim's age is to be the focus of section 12-13(a)(2) regarding whether the victim was unable to understand the nature of the act or was unable to give knowing consent, then a consequence of so concluding would be–as the State acknowledged at oral argument in this case–that this definition would apply to other possible victims as well, not just the 13-year-old victim in this case.

¶ 63       Another such victim would be a girl who was, perhaps, 16 years and 11 months old. Under the "legal condition" construction of section 12-13(a)(2), if the accused, say, the 17-year-old boyfriend of the 16-year-old girl, committed an act of sexual penetration with his girlfriend (who, let's assume, was a fully willing participant in the act) and the accused knew that the victim was 16 years old, then *as a matter of law* he knew that the victim was unable to understand the nature of the act or was unable to give knowing consent. That means he committed a nonprobationable, Class 1 felony. This outcome would, of course, be ridiculous,

but it is nonetheless the result compelled by the State's "legal condition" construction of the statute.

¶ 64 Additionally, I note that section 12-13(a)(2) contains no age reference at all. That means that an accused, who would be guilty of criminal sexual assault (the aforementioned nonprobationable Class 1 felony) for engaging in an entirely consensual act of sexual penetration with a 16-year-old female, could himself be 17 years old and still be guilty of that crime.

¶ 65 Another consequence of the majority opinion that a 15-year-old male who had entirely consensual sexual intercourse with his 16-year-old girlfriend would also be guilty of the nonprobationable Class 1 felony of criminal sexual assault, albeit as a juvenile delinquent. And, by the way, so would she!

¶ 66 The majority attempts to explain away such results by writing the following:

"[B]ecause the State has to prove the accused knew the victim was unable to consent, it would be highly unlikely any sexual contact between two similarly aged teenagers under 17 or sex with a person almost 17 would be punishable under section 12-13(a)(2). Thus, we disagree with any suggestion the inability to consent based on age is excluded from section 12-13(a)(2) because it would produce an illogical result." *Supra* ¶ 33.

¶ 67 The above quotation is significant for two reasons. First, it constitutes an implied admission by the majority that P.V.'s supposed "inability to consent" is based on nothing but her age. In other words, P.V.'s "legal condition," not her mental condition, is the basis for the majority's decision to affirm defendant's convictions.

¶ 68 Second, other than the hope that a local prosecutor would have the good sense not to charge a 17-year-old boy with the nonprobationable Class 1 felony of criminal sexual assault under section 12-13(a)(2) because he engaged in sexual intercourse with his entirely willing 16-year-old girlfriend, on what does the majority rely to claim that such a charge "would be highly unlikely"? *Supra* ¶ 33. After all, based upon my experience of 42 years with the criminal justice system in this state, I am shocked at the very charges some prosecutor brought in this case and take the view that they (1) clearly do not apply and (2) are entirely unsupported by the evidence. Construing criminal statutes should not be based upon the hope that no prosecutor will ever bring ridiculous charges; instead, courts should forthrightly reject those charges that are not consistent with Illinois law and reverse any convictions obtained thereunder.

¶ 69 C. The Majority's Reliance Upon *Whitten*

¶ 70 The majority relies upon its interpretation of *Whitten* as justification for its notion that criminal sexual assault is committed under section 12-13(a)(2) when a person, like defendant in the present case, engages in sexual relations with a person who, *for any reason*, is unable to give knowing consent. The majority claims the phrase "for any reason" in *Whitten* justifies its view that the legal condition of P.V.–namely, her age–is sufficient to prove that charge. That conclusion is clearly wrong and finds no basis for support in *Whitten*.

¶ 71 In *Whitten*, the complainant was "a 32-year-old developmentally disabled female with

-13-

an intelligence quotient (IQ) of 54 and a functional level of nine years and nine months." *Whitten*, 269 Ill. App. 3d at 1039, 647 N.E.2d at 1064. She resided in a residential living program for developmentally disabled adults, and the defendant, a 56 year-old male, was an employee of that residential unit who, on the evening in question, entered her apartment by using a pass key. He then allegedly committed a criminal sexual assault upon her. *Whitten*, 269 Ill. App. 3d at 1039, 647 N.E.2d at 1064. The *Whitten* court then wrote the following:

> "Complainant's testimony revealed that she did not consent to sexual intercourse with defendant. She testified that defendant did not ask her permission, and in fact, he did not say a word to her. Complainant stated that she did not give him permission to have sex with her and that she did not want to have sex with defendant. ***

> Complainant testified that she had not received any sex education. Additionally, Helton [(her case coordinator)] testified that complainant had an IQ of 54 and was mildly mentally retarded, but that she functioned at the 9-year-9-month-old level. While complainant cooked some meals for herself and could go shopping and received money for her work at the rehabilitation center, the evidence presented at trial created the inference that she had never lived alone. Helton had known complainant for about 12 years and had counseled her regularly regarding her problems in dealing with other people. Helton also testified that, in her opinion, complainant would not understand the long-term ramifications of a sexual relationship; that complainant would not know she could refuse the sexual advances of a staff member; and that a person had to be very basic with complainant.

> * * *

> Here, complainant's mental disability, her lack of sex education, and her statements that she had sex with defendant against her will, when combined with Helton's testimony regarding her understanding and the contradictions in defendant's and Lilly's testimony, meet the burden of proof required of the State regarding complainant's inability to give knowing consent. Further, defendant was in a position of authority, which would deter complainant from refusing defendant's sexual advances." *Whitten*, 269 Ill. App. 3d at 1040-42, 647 N.E.2d at 1065-66.

¶ 72 The above recitation from *Whitten* makes clear that decision provides no support for the majority's premise that P.V.'s age–*without more*–can constitute a basis for concluding that she was unable to give knowing consent. That the majority relies on *Whitten* for support reveals the dearth of support in Illinois law is for its position. The majority may rely on *Whitten* because no other Illinois case offers the majority any support and *Whitten* at least contains a phrase that–albeit taken out of context–at first blush seems supportive.

¶ 73 In *People v. Blunt*, 65 Ill. App. 2d 268, 212 N.E.2d 719 (1965), the court addressed the issue now before us because the defendant was charged with rape under a statute that defined that crime (in part) as intercourse which occurred "[w]here the female is so mentally deranged or deficient that she cannot give effective consent to intercourse." Ill. Rev. Stat. 1963, ch. 38, ¶ 11-1. The defendant was convicted, and the sole issue was whether the 23-year-old prosecuting witness was so mentally deficient that she could not give effective consent to an act of intercourse. *Id.* Some expert witnesses testified that the victim had an

-14-

IQ ranging from 71 through 78, and she was further described as mentally deficient. *Blunt*, 65 Ill. App. 2d at 269-70, 212 N.E.2d at 720. This court reversed the defendant's conviction, explaining as follows:

"Mere mental derangement or mental deficiency is not enough. Its thrust must be of sufficient magnitude to throttle effective consent. To what does the term 'mentally deficient' relate? Does it imply the lack of mental capacity and training to understand calculus, the provisions of the Internal Revenue Code or the doctrine of dependent relative revocation in wills? We think not. *** Does it mean the inability to understand and comprehend the act of sexual intercourse, its moral aspects and the evil consequences which may flow from it? Again this record establishes such comprehension. ***

In other jurisdictions where punishment is imposed upon those having sexual intercourse with females who through unsoundness of mind are incapable of effective consent, the capacity to consent 'presupposes an intelligence capable of understanding the act, its nature and possible consequences.' 44 Am Jur Rape, § 10, Ann Cas 1912B 1050. We think this record attributes to [the victim] that intelligence. The bizarre events of this record cannot be equated with [the victim's] lack of knowledge of the nature of the act nor of its moral reprehensibility nor of the possible fruits of its enjoyment. Morally distasteful as it is, it is not within the proscription of criminal sanctions under our Criminal Code relating to forcible rape." *Blunt*, 65 Ill. App. 2d at 273-74, 212 N.E.2d at 722.

¶ 74    In *People v. Maloney*, 201 Ill. App. 3d 599, 611-12, 558 N.E.2d 1277, 1285 (1990), then-Appellate Court Justice Charles Freeman wrote an opinion for the First District Appellate Court that affirmed the defendant's conviction for criminal sexual assault under section 12-13(a)(2) of the Criminal Code and rejected the defendant's claim that *Blunt* required a different result. In *Maloney*, although the victim was 16 years old, he had a mental age of 7 and attended school for severely learning-disabled children. *Maloney*, 201 Ill. App. 3d at 611, 558 N.E.2d at 1285. The appellate court found ample basis in the record for a rational jury to conclude that the State had proved that the victim was unable to understand the nature of the acts of sexual penetration or to give knowing consent thereto and noted that "we believe that the whole scenario of the contact between defendant and [the victim] clearly reveals that defendant sought to take advantage of [the victim's] reduced mental abilities after becoming aware of them during his conversation with him." The *Maloney* court agreed with *Blunt* that "[m]ere mental derangement or *** deficiency is not enough. Its thrust must be of sufficient magnitude to throttle effective consent." (Internal quotation marks omitted.) *Maloney*, 201 Ill. App. 3d at 611-12, 558 N.E.2d at 1285. The *Maloney* court found that standard to have been met in the case before it.

¶ 75    In *People v. Velasco*, 216 Ill. App. 3d 578, 587, 575 N.E.2d 954, 960 (1991), this court affirmed the defendant's conviction for criminal sexual assault under section 12-13(a)(2) of the Criminal Code where the complainant was born with Down's syndrome, her functional level was somewhere between that of a six-year-old and an eight-year-old, she had been classified as trainably mentally handicapped, and she did not understand "where babies come from."

¶ 76    In *People v. Fisher*, 281 Ill. App. 3d 395, 397, 667 N.E.2d 142, 143 (1996), the defendant was convicted of criminal sexual assault under section 12-13(a)(2) of the Criminal Code for committing an act of sexual penetration with a person whom he knew to be unable to give knowing consent. The defendant had engaged in sexual intercourse with a girl who was rendered unconscious after she consumed a large quantity of alcohol. The appellate court affirmed the defendant's conviction, holding that a reasonable fact finder could conclude that the amount of alcohol ingested by the 125-pound complainant could have left her incapable of being sufficiently roused to have knowingly given or refused consent to the defendant's advances. *Fisher*, 281 Ill. App. 3d at 403, 667 N.E.2d at 147. *Weiss* (where the victim was 34 years old and functioning at the level of a 4-year-old child) and *Barnslater* (where the victim was in a drunken stupor), previously mentioned, follow in this vein.

¶ 77    My reason for listing all of these cases is to point out that in the history of Illinois jurisprudence no published opinion has done what the majority opinion would do in this case: affirm a defendant's conviction for criminal sexual assault under section 12-13(a)(2) of the Criminal Code based solely upon the victim's legal condition–namely, her age–and not based upon her acuity in any way. I respectfully disagree with this unprecedented view.

¶ 78    D. The Majority Disregards the Legislative Structure Defining Sex Offenses

¶ 79    With commendable candor, the State conceded at oral argument before this court that its claim that P.V. was unable to give knowing consent was essentially based upon two facts: (1) she was 13 years old and (2) 13-year-olds cannot "consent" to acts of sexual penetration, however willingly they may have engaged in them. This argument is not consistent with how the Illinois legislature has defined sex offenses in the Criminal Code.

¶ 80    The Criminal Code reveals that the legislature is perfectly capable of saying precisely what it intends when it is defining crimes based, at least in part, upon the age of the victim. Indeed, in the *very same section* of the Criminal Code at issue in this case–namely section 12-13(a)–(albeit in a different subsection) the legislature defines criminal sexual assault as follows:

> "(a) The accused commits criminal sexual assault if he or she:
>
> * * *
>
> (4) commits an act of sexual penetration with a victim who was at least 13 years of age but under 18 years of age when the act was committed and the accused was 17 years of age or over and held a position of trust, authority or supervision in relation to the victim." 720 ILCS 5/12-13(a)(4) (West 2008).

In section 12-16(d), the legislature defined "aggravated criminal sexual abuse" as follows:

> "(d) The accused commits aggravated criminal sexual abuse if he or she commits an act of sexual penetration or sexual conduct with a victim who was at least 13 years of age but under 17 years of age and the accused was at least 5 years older than the victim." 720 ILCS 5/12-16(d) (West 2008).

What sections 12-13(a)(4) and 12-16(d) have in common is that the legislature determined that the willingness of the victim to engage in the sexual acts in question did not matter

because of the victim's age. In other words, even if the victim consented to or solicited the acts in question, the adult engaging in those acts with the victim would still be guilty of the crimes defined if the State was able to prove the other elements. For purposes of the present case, what is significant about what the legislature did in section 12-13(a)(4) and section 12-16(d) is that by removing the issue of consent from those statutes, the legislature eliminated any reference to the issue of consent by–literally–not using that word.

¶ 81     Other examples from the Criminal Code in which the legislature defined a crime and eliminated any issue of the victim's willingness to engage in the sexual conduct in question by omitting any reference to whether or not the victim consented can be found as follows: (1) section 12-14.1, defining predatory criminal sexual assault of a child (720 ILCS 5/12-14.1 (West 2008)); (2) sections 12-15(b) and 12-15(c), defining two forms of criminal sexual abuse (720 ILCS 5/12-15(b), (c) (West 2008)); (3) section 12-13(a)(3), defining one version of criminal sexual assault (720 ILCS 5/12-13(a)(3) (West 2008)); (4) sections 12-14(b) and 12-14(c), defining two versions of aggravated criminal sexual assault (720 ILCS 5/12-14(b), (c) (West 2008)); and (5) section 12-16(b), section 12-16(c)(1)(i), section 12-16(c)(2)(i), section 12-16(d), section 12-16(e), and section 12-16(f), defining various forms of the offense of aggravated criminal sexual abuse (720 ILCS 5/12-16(b), (c)(1)(i), (c)(2)(i), (d), (e), (f) (West 2008)).

¶ 82     Despite the above statutes and the legislative structure they represent, the State maintains (and the majority agrees) that section 12-13(a)(2) should be construed to read as follows: "The accused commits criminal sexual assault if he or she commits an act of sexual penetration and the accused knew that the victim was under 17 years of age when the act was committed." "Consent" in a real-world context would then become entirely irrelevant.

¶ 83     This interpretation is totally wrong. The word "consent" in section 12-13(a)(2) should be given its common, ordinary meaning–namely, compliance in or approval of what is done or proposed by another. Merriam-Webster's Collegiate Dictionary 245 (10th ed. 2000). As the record in this case reveals, that definition fits how P.V. responded to defendant's sexual overtures. In *People v. Beasley*, 314 Ill. App. 3d 840, 846, 732 N.E.2d 1122, 1127 (2000), the First District Appellate Court explained "consent" in this context as follows:

> " ' "Consent" implies a willingness, voluntariness, free will, reasoned or intelligent choice, physical or moral power of acting, or an active act of concurrence (as opposed to a passive assent) unclouded by fraud, duress, or mistake. [Citation.] The ability to give knowing consent should involve more than measuring complainant's IQ or ability to physically resist defendant.' *Whitten*, 269 Ill. App. 3d at 1042-44[, 647 N.E.2d at 1066]."

¶ 84                    E. The Record Contains No Evidence That P.V. Was
                        Unable To Give Knowing Consent

¶ 85     The State failed to present any evidence that P.V. was unable to give knowing consent. In fact, the State's evidence showed that P.V. voluntarily complied with the sexual acts defendant proposed. P.V.'s ability to give knowing consent is perhaps best shown by her willingness to *withhold her consent* when defendant suggested that they engage in sexual intercourse or that she perform oral sex upon him. She had sufficient understanding of the

circumstances as well as confidence in herself to say, in effect, "This far, but no further." And he complied with the line she drew. These circumstances belie the notion that P.V. was anything like the victim in *Whitten*, who clearly (due to her mental condition) was unable to give knowing consent, or like the victims in any of the other cases discussed herein.

¶ 86                          F. The State Charged Defendant With the Wrong Crime

¶ 87       Defendant's knowledge of P.V.'s age is the *sole* basis for the State's claim that defendant knew she was unable to give knowing consent. As noted earlier, this record is devoid of any evidence suggesting that P.V. did not understand the nature of the acts defendant engaged in with her or was unable to give knowing consent to his doing so. The absence of any such evidence explains why the State on appeal based its entire case upon P.V.'s age and cited nothing else.

¶ 88       The majority writes that "the focus of our analysis is on what defendant knew. Contrary to any suggestion by the State, the mere fact that P.V. was 13 alone is insufficient to prove 'the accused knew the victim was unable to understand the nature of the act or was unable to give knowing consent.' [Citation.]" *Supra* ¶ 34. So, even though (in this instance) the majority claims to disagree with the State that the mere fact of P.V.'s age alone was sufficient to prove the charge against defendant, the majority fails to cite *any other evidence* in the record–other than P.V.'s age–indicating that she was unable to understand the nature of the act or was unable to give knowing consent.

¶ 89       In fact, in the very next paragraph, the majority writes that "[t]he State's evidence also shows defendant knew P.V. could not knowingly consent due to her young age." *Supra* ¶ 35. However, the only support for this assertion is defendant's repeatedly telling P.V. not to tell anyone what they had been doing and mentioning he could get "45 to life." But, of course, all that shows is that defendant knew P.V. was (in common parlance) "jail bait." He may not have known the statutory citation, but he knew that engaging in sexual activities with a 13-year-old was a crime. And he was right. The trouble, however, is that the State chose to charge him with the *wrong* crime–that is, criminal sexual assault under section 12-13(a)(2)–instead of the crime he should have been charged with–namely, aggravated criminal sexual abuse under section 12-16(b). 720 ILCS 5/12-16(d) (West 2008).

¶ 90       The record shows that the State presented more than enough evidence to prove defendant committed aggravated criminal sexual abuse, which section 12-16(d) of the Criminal Code defines as follows: "The accused commits aggravated criminal sexual abuse if he or she commits an act of sexual penetration or sexual conduct with a victim who was at least 13 years of age but under 17 years of age and the accused was at least 5 years older than the victim." 720 ILCS 5/12-16(d) (West 2008). Aggravated criminal sexual abuse is a probationable Class 2 felony. 720 ILCS 5/12-16(d) (West 2008); 730 ILCS 5/5-5-3 (West 2008).

¶ 91       Unfortunately, the State did not charge defendant with that crime. Instead, the State charged him *only* with multiple counts of criminal sexual assault, a nonprobationable Class 1 felony (720 ILCS 5/12-13(a) (West 2008); 730 ILCS 5/5-5-3(c)(2)(H) (West 2008)) based upon the State's claim that defendant knew that the minor victim, P.V., was unable to

-18-

"understand the nature of the act" or "unable to give knowing consent." That defendant may in fact be guilty of *some* felony sex offenses involving a 13-year-old child is not a matter this court may consider when evaluating the sufficiency of the evidence regarding the *actual charges* the State chose to bring against defendant. For the reasons previously stated, because the State failed to prove those charges at trial, this court should reverse all of defendant's convictions.

¶ 92                                    II. EPILOGUE

¶ 93     In my 22 years on this court, I have never written an opinion to reverse a criminal conviction based on the insufficiency of the State's evidence. Nor have I written a dissent, as here, arguing that the majority has erred by failing to reverse a defendant's conviction on the grounds of insufficient evidence. This long-standing record is in no small measure due to my deference to the trier of fact and my unwillingness to second-guess it.

¶ 94     This case is different. Here, we need not reweigh the evidence because there is no evidence to weigh. Once the State's claim is rejected–that based solely on P.V.'s age, she was unable to understand the nature of the act or unable to give knowing consent–this record is totally bereft of any evidence to sustain defendant's convictions.

¶ 95                                    III. CONCLUSION

¶ 96     The majority reverses some of defendant's convictions and affirms others. Because I conclude all of his convictions should be reversed, I concur in part and dissent in part. While I concur in the reversal on count I, I would reverse outright and would not remand for a new trial.