THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES MICHAEL MALONEY, Defendant-Appellant.

First District (3rd Division)   No. 1—88—2603

Opinion filed July 18, 1990.

Paul Bradley, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Michael J. Drake, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, James Michael Maloney, was charged with nine counts of criminal sexual assault. The trial court granted defendant's motion for a directed verdict on three counts alleging that the assault was accomplished by force or the threat of force. Thereafter, defendant was convicted by a jury of the remaining counts. The trial court sentenced defendant to five years' imprisonment. He appeals his convictions.

The State's witnesses testified as follows.

THE VICTIM'S MOTHER

The victim's mother (hereinafter C.M.) and the victim, a then 15-year-old "multiple handicapped" and severely "learning disabled" male (hereinafter S.M.), went to a laundromat at 2861 North Clybourn in Chicago in the early afternoon of August 20, 1987. C.M. and S.M. were sitting in the laundromat waiting for their washing to be done. Defendant sat next to S.M. At that time, S.M. was showing defendant a "Bugs Bunny" book and talking to him. After approximately 20 minutes, C.M. got up to remove her laundry from the washer. When C.M. turned around, after removing all of her clothes, and realized that S.M. "wasn't there," she called out for him. "[T]he people there said he went to the washroom with that man." C.M. then yelled for S.M. again. As C.M. started going toward the bathroom, S.M. came running out and said, "[M]ommie, that man sucked my prick, I mean my dick." At that time, defendant emerged from the bathroom, saying that he had not done anything to S.M. He then went to the washing machines, removed all of his wet clothes, "took the cart and ran across the street."

C.M. called the police. She had to calm S.M. down because he was hysterical and then took him outside. The police arrived within 10 minutes. C.M. and S.M. then went around the block with the police looking for the assailant but did not find him. Upon returning to the laundromat, C.M. spoke with a young Spanish girl. After their conversation, C.M., S.M. and the police officers went to 2848 North Clybourn. C.M. and S.M. waited downstairs while the police went to the third floor. After a few minutes, the police descended to get the building manager. When the police found the manager, they, C.M. and S.M. went to the third floor. Thereafter, the manager "unlocked the door and [defendant] was in the apartment sitting there with his wig on." C.M. recognized defendant but said, "[H]e is wearing a wig." C.M. "knew he had a wig on but [she] didn't forget his face." S.M. did not identify defendant. C.M. thought S.M. was afraid. She described defendant as wearing a green and white shirt, beige pants and hat in the laundromat. C.M. had never seen defendant before August 20, 1987.

On August 25, C.M. and S.M. were taken to the police station by Detectives Kurth and Gavin. The detectives had called C.M. and told her that they were going to arrest "the preacher—the man, the defendant."

On cross-examination, C.M. reiterated that she identified defendant to the police on August 20 upon seeing him in his apartment. She denied telling the detectives that she was unable to identify the man in the laundromat. She also denied, and stated she could not remember telling the detectives, that she had seen only the back of the head of the man in the laundromat. She further denied that she was not asked to view the lineup containing defendant because she had told the detectives she could not identify S.M.'s assailant. C.M. admitted that the police did not find any wet clothing in the apartment or a hat, green shirt or beige pants.

THE VICTIM

While in the laundromat on August 20 with C.M., S.M. was showing defendant, who was seated next to him, his "Bugs Bunny" book and asking him about his family, *i.e.*, whether he had a "grandma" and whether she was alive or dead. After C.M. got up to fold the laundry, defendant asked S.M., "[Y]ou want to suck my penis[?]" and S.M. "went along" and said he did not want to, after which defendant told S.M., "[C]ome with me anyways." S.M. then got up and followed defendant into the bathroom. Upon entering the bathroom, defendant pulled down S.M.'s shorts and sucked his penis. Defendant then in-

serted a finger in S.M.'s anus. Thereafter, S.M. put his mouth on defendant's penis then pushed away from it, went out and screamed, "[M]ommie." Upon observing defendant in his apartment after the arrival of the police, S.M. did not recognize him because, "[H]e looked different, he looked ugly." Defendant had worn green pants, a green shirt and a green cap in the laundromat.

On cross-examination, S.M. admitted telling the police that he did not recognize defendant upon seeing him in his apartment but maintained that his mother had done so. He also admitted that, before viewing the lineup on the 25th, the detectives told him to pick out the man who did "it" to him, as a result of which S.M. knew that somebody in the lineup was the man who had been in the bathroom with him. Finally, S.M. admitted telling the detectives that he had not put his mouth on his assailant's penis.

PENNY WILCOX

She was in the laundromat on Clybourn in the afternoon of August 20, 1987, along with a friend named Katherine, S.M., C.M. and defendant. Defendant was sitting next to S.M., who was sitting next to C.M. Defendant got up and S.M. followed him into the bathroom. Five minutes after defendant and S.M. entered the bathroom, C.M., who had been tending to her laundry, realized S.M. was gone and began calling out for him. Thereafter, S.M. emerged from the bathroom, "pulling up his shorts," and defendant emerged, "zipping his pants." C.M. then asked S.M. what defendant had done to him. S.M. answered that "he sucked my thing and I did his" and asked if he had done anything wrong. Defendant stated that he had done nothing to S.M. He then ran to a washing machine, removed his clothes, put them in a clothes basket and "ran off across Clybourn."

Wilcox had seen defendant prior to August 20 walking around the neighborhood passing out flags, fliers and candy to the children. Wilcox knew defendant prior to August 20 only as the "Preacher Man." Defendant dressed like a preacher and wore a hat and a wig. However, on the 20th, defendant wore a pair of beige pants, and a "flowery shirt with green in it." He also wore a cap but no wig. Wilcox did not stay at the laundromat until the police arrived on August 20. Rather, she spoke to detectives Gavin and Kurth on the 25th between 10 and 10:30 p.m., outside of 2828 N. Clybourn. Later that evening, at about 12:30 a.m., the detectives returned to Clybourn and asked Wilcox if she was willing to go the police station and "pick the man out of the lineup." At the police station, Wilcox, who viewed the lineup after the victim, identified defendant. Finally, none of Wilcox'

direct testimony was in any way contradicted or impeached by her testimony under cross-examination.

KATHERINE RILEY

She was in the laundromat on Clybourn on August 20. A person named Penny, S.M. and defendant were also in the laundromat. The latter two were reading a "Bugs Bunny" book. Although she did not then know defendant's name, she had seen him around the neighborhood, "by the bus stop," "walking the streets" and "by the school sometimes." Prior to the 20th, Riley had seen defendant "several" and about "five to ten" times. On the 20th, defendant wore a hat, a plaid shirt with a lot of pink, blue and green in it and some jeans, although she was not sure of the latter. Riley saw defendant take S.M. into the bathroom. They were in the bathroom for 5 to 10 minutes. When S.M. and defendant came out of the bathroom, C.M. asked him what he had been doing in the bathroom. S.M. responded that "he sucked me and I sucked him." Defendant then went to a washing machine and started removing his clothes rapidly. Defendant then ran down Clybourn. On the prior occasions when she had seen defendant, he sometimes wore a wig and sometimes he did not. He also, sometimes, wore a black coat, a wig, a hat and dark glasses. He had flags in his hands all the time. On those occasions when he did not wear a wig, defendant would "probably" wear a hat since he wore hats "all the time."

On cross-examination, Riley testified that she did not talk to the police because C.M. "went out and the police had *** left and we didn't see them no more that day." Riley did not go to the police station within a week or two of the incident because she thought "they had caught him." It was not until 8 or 10 months later that Riley "had contact with anybody." During the time Riley was in the laundromat, defendant had come up to her while she was putting a quarter in the dryers and she told him that "the word is excuse me."

CHICAGO POLICE OFFICER COLLEEN GLEASON

She and her partner responded to C.M.'s call to the police on August 20. Upon entering defendant's apartment in the course of investigating the call, while S.M. did not know if defendant was his assailant, C.M. "seemed fairly certain" and "was *** quite certain" that defendant was S.M.'s assailant.

On cross-examination, Gleason could not recall whether any clothes fitting the description given by C.M. and S.M. of those worn by S.M.'s assailant were found in defendant's apartment. She admit-

ted that no property from the apartment was inventoried by the police. Gleason also could not recall whether any wet clothes were found in the apartment. She did admit, however, that no such clothing was inventoried. Gleason also admitted that she did not include in her report the fact that C.M. had identified defendant. Finally, Gleason admitted that S.M. had not told her that he had placed his mouth on his assailant's penis and that the assailant had inserted a finger in S.M.'s anus.

CHICAGO POLICE DETECTIVE CARL KURTH

On August 25, 1987, he and his partner became involved in the sexual assault upon S.M. Upon leaving defendant's apartment building after unsuccessfully attempting to gain entry on August 25, Kurth and his partner ran into some women outside the building, one of whom was Penny Wilcox. The detectives asked the women if they knew who the "Preacher Man" was. Wilcox gave the detectives a response to the question. Thereafter, the detectives returned to the police station and, after examining a listing of unlisted telephone numbers, discovered that a James Maloney resided at 2848 North Clybourn. After calling defendant, the detectives returned to his apartment and, after he opened the door, placed him under arrest. Upon transporting defendant to the police station, the detectives attempted to locate arrestees from other police stations of builds and descriptions similar to defendant's in order to conduct a lineup. However, their efforts were unsuccessful. The detectives therefore decided to use other detectives in the lineup. Subsequently, Wilcox and S.M. identified defendant out of the lineup.

On cross-examination, Kurth admitted the following. C.M. told him on the 25th that she was unable to identify defendant after seeing him in his apartment on the 20th. That was the reason she did not view the lineup. C.M. also told him that she had seen only the back of the head of the man in the laundromat. Also, S.M. had told him that he had not placed his mouth on his assailant's penis. The police did not find any clothing "that matched the description" upon searching defendant's apartment after his arrest. He told the people who were going to view the lineup that the police had made an arrest but did not tell them that "that person would be in the lineup."

OPINION

On appeal, defendant first contends that the trial court erred in denying his motion to suppress his lineup identifications by S.M. and Wilcox on August 25, five days after the alleged assault. Specifically,

relying upon the differences in appearance between defendant and the police officers who participated in the lineup, defendant asserts that the placing of a suspect in a lineup with persons of dissimilar appearance is grounds for suppressing evidence of the lineup identification. (*People v. Morris* (1970), 131 Ill. App. 2d 443, 266 N.E.2d 444.) Defendant further asserts that he sustained his burden of proving that the procedures used in his lineup were so suggestive that they created a substantial likelihood of irreparable misidentification and were unnecessary under the totality of the circumstances surrounding the lineup. *People v. Tuttle* (1972), 3 Ill. App. 3d 326, 278 N.E.2d 458.

■ Preliminarily, we must note what is, in effect, a concession by the State with regard to the burdens which defendant was required to meet to obtain suppression of the lineup identifications. In contrast to the burdens established in *Tuttle*, the State asserts only that lineup identifications must be suppressed where the procedure used is unnecessarily suggestive and there was a substantial likelihood of misidentification (*People v. Sykes* (1987), 161 Ill. App. 3d 623, 515 N.E.2d 253). In view of the standard cited by the State, we need not determine whether defendant adequately proved that the procedure used in his lineup, meaning the use of police officers rather than other arrestees, was unnecessary under the circumstances surrounding the lineup.

■ Applying the standard cited by the State, we find that defendant adequately proved that the procedure used in his lineup was unnecessarily suggestive and that it created a substantial likelihood that defendant might be misidentified from among the other lineup participants as C.M.'s assailant. In short, we believe that the trial court's denial of defendant's motion to suppress was manifestly erroneous.

We reach the foregoing conclusions on the basis of the color photograph of the lineup from which C.M. and Wilcox identified defendant. Neither mere words nor a black-and-white reproduction of the photograph can adequately convey the inherent unfairness of the lineup depicted in the color photograph included as an exhibit in the record. Nonetheless, we: (1) will attempt to describe its unfairness in words; and (2) will append to our opinion such a reproduction of the photograph.

The photograph of the lineup reveals the following. Five men, including defendant, participated in the lineup. Defendant occupied the first seat on the viewer's left. To defendant's left are three men, all of whom are wearing clean, pressed, white shirts, pressed gray slacks, socks and shoes or boots, and wrist watches. The fourth man to defendant's left and on the viewer's extreme right is wearing a clean,

pressed, pullover blue shirt, pressed blue jeans, socks and shoes and a wristwatch. In contrast to these four men, defendant is wearing a wrinkled, dark brown and/or extremely soiled shirt which appears to be a nightshirt or woolen undershirt. He is wearing a pair of wrinkled blue slacks and black shoes. He is not wearing socks and no watch appears evident on either wrist. In addition, defendant's hair, in comparison to the four other men, appears uncombed. In general terms, defendant appears unkempt and disheveled while the four other men in the lineup appear well, if casually, dressed and well groomed.

We find the differences in the appearance of defendant and the four other lineup participants, in terms of manner of dress and grooming, as depicted in the photograph to be so extreme as to be unnecessarily suggestive of defendant as the guilty party. In addition, we find that the seating of three men dressed almost identically to one another immediately next to defendant and between him and the fifth man in the lineup so draws the viewer's attention to defendant as to greatly exacerbate that suggestiveness. Finally, when the difference in physical size, specifically the weight difference, between defendant and the four men in the lineup is added to the differences between them in the former regards, we find the lineup so suggestive of defendant as the guilty party as to have been improper *per se*. The lineup procedure in this case all but hung a sign saying "pick me" around defendant's neck. We do not believe that a court of review must tolerate and condone such police procedures.

We recognize the existence of case law holding, in contrast to *Morris*, cited by defendant, that participants in a lineup are not required to be physically identical (see, *e.g., People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612, *cert. denied* (1989), 489 U.S. 1100, 103 L. Ed. 2d 943, 109 S. Ct. 1577) and that claims of suggestiveness due to significant differences in the age, size, and appearance of a defendant and other participants in a lineup go to the weight of the evidence, not necessarily its admissibility (see, *e.g., People v. Brewer* (1983), 118 Ill. App. 3d 189, 454 N.E.2d 1023, *cert. denied* (1984), 469 U.S. 930, 83 L. Ed. 2d 261, 105 S. Ct. 234). However, we believe that, in this case, those differences are so manifestly extreme that the only possible conclusion we can reach as a court of review is that the lineup was unfair as a matter of law.

Notwithstanding the foregoing conclusion, however, the trial court's error in failing to suppress Wilcox' and S.M.'s lineup identifications of defendant does not warrant a reversal of his convictions. In view of the in-court identifications of defendant by C.M., S.M., Wilcox and Riley, we believe that the trial court's error was harmless beyond

a reasonable doubt. A trial free of the lineup identification evidence would not have resulted in an acquittal of defendant. Moreover, we believe the record adequately reveals an independent origin for all of the in-court identifications of defendant, namely the opportunity which all four occurrence witnesses had to see him in the laundromat. The record makes unnecessary a remand for a determination of whether such a basis for those identifications exists.[1]

█ It is evident from the foregoing that we reject defendant's related contention that he was not identified beyond a reasonable doubt as S.M.'s assailant. In this regard, we note that, in passing upon this issue, we are required to view the evidence in the light most favorable to the State and cannot reverse defendant's conviction unless we can say that no rational jury could have found this necessary element of the convictions beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 268, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.

Defendant asserts that C.M.'s identification of him as the assailant was worthless because her testimony that she could identify him was false. As conclusive proof of that falsity, defendant cites the testimony of Detective Kurth that C.M. told him that she had been in defendant's apartment minutes after the incident and could not identify him and that she had seen only the back of his head in the laundromat.

█ In so arguing, defendant ignores C.M.'s testimony that she recognized defendant as the assailant at his apartment shortly after the incident and that she told the police at that time that she could identify him. He also ignores Officer Gleason's testimony that C.M. said she was "quite certain" defendant was the man in the laundromat after seeing him in his apartment after the incident. In view of this evidence, we do not agree that C.M.'s in-court identification of defendant was worthless. In this regard, we agree with the State that the jury's resolution of the issue of identification is subject, on appeal, to the black letter rule that the credibility of the witnesses, the weight to be given their testimony and the inferences to be drawn therefrom are for the trier of fact. See, *e.g., People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 268.

Defendant further asserts that his in-court identification by S.M. was worthless because S.M. was unable to identify him in his apartment shortly after the incident. We cannot agree. It is undisputed

---

[1]We discuss the independent origin of S.M.'s and Wilcox' in-court identifications of defendant in greater detail below.

that when the police, C.M. and S.M. entered defendant's apartment, his clothing was different from the clothing S.M.'s assailant had worn in the laundromat. It is also undisputed that defendant was wearing a wig in his apartment which the assailant had not worn in the laundromat. In addition, C.M. testified that S.M. became hysterical after emerging from the bathroom with defendant and that he was scared upon entering defendant's apartment. In view of these facts, S.M.'s inability to identify defendant in his apartment is understandable. Also understandable from the lack of all of these factors is S.M.'s ability to identify defendant at trial.[2]

Moreover, as a matter of law, a victim's or witness' inability to identify a defendant subsequently to, even soon after, the commission of the offense charged does not render incompetent and inadmissible his identification of the defendant at a later lineup or an even later trial. (See *People v. Flint* (1986), 141 Ill. App. 3d 724, 490 N.E.2d 1025; *People v. Rosa* (1981), 93 Ill. App. 3d 1010, 418 N.E.2d 124, *cert. denied* (1982), 455 U.S. 952, 71 L. Ed. 2d 668, 102 S. Ct. 1457; see also *United States ex rel. Kosik v. Napoli* (7th Cir. 1987), 814 F.2d 1151.) We believe that the weight to be given S.M.'s in-court identification of defendant was for the jury to decide.

Defendant further asserts that, while the identification testimony of Wilcox and Riley was not directly impeached, the length of time it took them to come forward, 5 days and 8 to 10 months, respectively, makes their testimony inherently suspect. Specifically, defendant argues that the length of time it took Wilcox and Riley to come forward reveals that, rather than having seen defendant in the laundromat on August 20, they were convinced of his identity by neighborhood gossip.

Simply put, we find defendant's argument against the validity of the identification testimony of Wilcox and Riley to be pure speculation and conjecture.[3] There is simply no record evidence, and defendant cites none, to support his "neighborhood gossip" theory. Rather than constituting *per se* impeachment of their testimony, the length of time it took Wilcox and Riley to tell the police what they knew merely went to the weight to be given their testimony.

In this last regard, defendant asserts that the passage of 8 to 10

---

[2]Having found that the trial court should have suppressed S.M.'s and Wilcox' lineup identifications of defendant, we need not address defendant's remaining arguments against the validity of S.M.'s lineup identification of him.

[3]Having found that the trial court should have suppressed S.M.'s and Wilcox' lineup identifications of defendant, we limit the present discussion, as it relates to Wilcox, to her in-court identification of him.

months before Riley came forward is a serious negative factor in the weight to be given her testimony. (*Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375.) However, we do not find *Neil* apposite to this case. *Neil* involved the identification of a rapist by the victim, who had not previously known the defendant. However, the record in this case sufficiently reveals that Riley, as well as Wilcox, were acquainted with defendant prior to the date of the incident. As such, the mere passage of time would not tend to cast as much doubt on either of their identifications of defendant as it did on the victim's identification in *Neil*.

Finally, defendant asserts that the identification evidence in this case is totally refuted by the failure of the police to find any corroborative evidence. Specifically, he notes that while S.M.'s assailant wore a shirt variously described as "green and white," "flowery," or "plaid" and beige pants, defendant was wearing a black suit when the police, C.M. and S.M. entered his apartment just 20 minutes later. Moreover, he notes that, while the assailant ran out of the laundromat with a cart full of wet clothes, neither the wet clothes nor the clothes worn by the assailant were found in defendant's apartment.

Obviously, the State would have had a stronger case against defendant had he been found wearing the clothes worn by S.M.'s assailant or had the police otherwise found those clothes and the wet clothes taken from the laundromat by the assailant. However, the short answer to defendant's argument is that none of the missing articles of evidence were required in order for a rational jury to have found him guilty of the offenses charged beyond a reasonable doubt. As such, the absence of those articles of evidence does not cast a serious doubt upon the State's witnesses' identifications of defendant nor fails to produce an abiding conviction of guilt. Finally, we note that 20 minutes, the time it took the police to enter defendant's apartment, was sufficient time to have changed out of the clothes worn at the laundromat, to secret them and to secret the wet clothes taken from the laundromat.

▮ Next defendant contends that the State failed to prove beyond a reasonable doubt that he knew S.M. was unable to understand the nature of the acts of sexual penetration committed by defendant or to give knowing consent thereto, as required under the criminal sexual assault statute (Ill. Rev. Stat. 1987, ch. 38, par. 12–13(a)(2)) and as alleged in the counts of which defendant was convicted.

At a hearing to determine S.M.'s competency to testify at trial,

evidence was adduced as to his mental abilities and problems. Each party cites testimony from that hearing, and the State also cites S.M.'s testimony at trial, to support its position on the issue of his understanding, or lack thereof, of the nature of the acts he engaged in with defendant and the issue of his knowing consent, or lack thereof, to those acts.

■ After reviewing that testimony in the light most favorable to the State, we conclude that a rational jury could have found sufficient evidence to prove beyond a reasonable doubt that S.M. was unable to understand the nature of the acts engaged in with defendant or to give knowing consent thereto and that defendant was aware of that inability.

With respect to S.M.'s lack of understanding and inability to knowingly consent, C.M. testified that, although 16 years of age at the time of trial, S.M. had a mental age of seven and attended a school for severely learning-disabled children. With respect to defendant's knowledge of the statutory factors, the record reveals that he had ample opportunity to assess S.M.'s limited mental capacity prior to asking S.M. to accompany him to the bathroom. Firstly, defendant encountered a 15-year-old male reading a "Bugs Bunny" comic book. Secondly, S.M. engaged defendant in what the State aptly describes as "child-like" conversation in which S.M. asked defendant about his family, whether he had a "grandma" and whether she was alive or dead. Thereafter, defendant asked S.M. to accompany him to the bathroom and, after he initially declined to do so, asked S.M. to accompany him "anyway," which S.M. did without protest.

The foregoing evidence provided an ample basis for a rational jury to conclude that the State had made either of the showings required under the criminal sexual assault statute. In fact, we believe that the whole scenario of the contact between defendant and S.M. clearly reveals that defendant sought to take advantage of S.M.'s reduced mental abilities after becoming aware of them during his conversation with him.

Defendant cites *People v. Blunt* (1965), 65 Ill. App. 2d 268, 212 N.E.2d 719, in support of his assertion that S.M. knew the nature of the acts engaged in with defendant or could knowingly consent to them. *Blunt* involved an alleged rape based on mental derangement or deficiency which prevented the giving of effective consent to intercourse. The victim in *Blunt* was a 23-year-old woman with an I.Q. between 71 and 78. In passing upon the extent of mental deficiency or derangement required under the rape statute involved, the court stated, "Mere mental derangement or *** deficiency is not enough.

Its thrust must be of sufficient magnitude to throttle effective consent." (*Blunt*, 65 Ill. App. 2d at 273.) In deciding whether the victim was so mentally deficient or deranged as to have been unable to give effective consent to the intercourse, the court concluded that the record evidence attributed to her the intelligence to understand the act, "its nature and possible consequences." *Blunt*, 65 Ill. App. 2d at 274.

*Blunt* is of no assistance to defendant in showing that S.M. knew the nature of the acts engaged in or knowingly consented to them. At bottom, defendant invites us to equate S.M.'s mere description of the acts engaged in with defendant and his use of slang words to refer to his penis to the much greater evidence of the victim's understanding of the act of intercourse and ability to knowingly consent thereto in *Blunt*. We decline to do so.

Defendant lastly contends that the State improperly told the jury in closing argument that defendant's knowledge of S.M.'s inability to understand the nature of the acts engaged in or to knowingly consent to them was not an issue in the case.

■■ ■ Preliminarily, we agree with the State that defendant waived any error in this argument by failing to object at trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Even if we consider the merits of this issue, however, we reject defendant's contention. We agree with the State that, read in the context in which it was made, *i.e.*, a broader discussion of the elements of criminal sexual assault, the complained-of statement was merely an expression of the prosecutor's belief either that there was no dispute as to the defendant's knowledge or that the State's evidence thereon was so overwhelming as to have rendered it a nonissue in the case. As such, we believe the prosecutor's remark was proper. A prosecutor may state an opinion based on the record or on a legitimate inference therefrom. *People v. Johnson* (1987), 119 Ill. 2d 119, 518 N.E.2d 100, *cert. denied* (1988), 486 U.S. 1047, 100 L. Ed. 2d 629, 108 S. Ct. 2027.

Moreover, whichever interpretation the statement was meant to convey, it cannot be reasonably construed as stating that the jury need not even consider the issue of defendant's knowledge. In this regard, the trial court specifically instructed the jury that, to sustain the charge of criminal sexual assault, the State was required to prove, in addition to an act of sexual penetration, that defendant knew the victim was unable to understand the nature of the act or to give knowing consent. It further instructed the jury that, if it found from the evidence that each of the elements had been proved beyond

a reasonable doubt, it should find the defendant guilty and *vice versa*. Where the trial court properly instructs the jury on the law, prosecutorial argument which misstates the law does not constitute error. *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746; *People v. Goodum* (1984), 127 Ill. App. 3d 350, 468 N.E.2d 1237.

For all of the foregoing reasons, we affirm defendant's convictions for criminal sexual assault.

Affirmed.

CERDA, P.J., and RIZZI, J., concur.

## APPENDIX