2025 IL App (1st) 231940-U

No. 1-23-1940

Order filed June 23, 2025.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 4387 |
| | ) | |
| KEVIN CHILDS, | ) | The Honorable |
| | ) | James Bryan Novy, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's convictions for aggravated criminal sexual assault are affirmed, where the evidence was sufficient to prove defendant's identity as the offender beyond a reasonable doubt. No error occurred in admitting a witness' other-crimes testimony and in-court identification of defendant, or in limiting the scope of that witness' cross-examination.

¶ 2   Following a bench trial, defendant Kevin Childs was found guilty of three counts of aggravated criminal sexual assault and sentenced to a total of 18 years in prison. As part of his sentence, the court ordered him to register as a lifetime sex offender. On appeal, he argues that the

evidence presented at trial didn't support the trial court's factual findings, that the court improperly admitted a witness' other-crimes testimony and in-court identification of him, and that the court improperly limited his cross-examination of that witness. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                                A. Pretrial

¶ 5     Defendant worked as a patient care technician (PCT) at St. Anthony Hospital (St. Anthony), located in the Lawndale area in Chicago. He was charged by indictment with six counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(4) (West 2022)) and one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(a)(6) (West 2022)), premised on an incident on January 25, 2022, in which he sexually assaulted a patient, M.B., at St. Anthony. Defendant's case was originally set for a jury trial.

¶ 6     Prior to trial, the State filed a motion to admit other-crimes evidence that, on January 18, 2022, defendant sexually assaulted D.C., another patient at St. Anthony on the same floor as M.B.[1] After hearing arguments, the trial court granted the motion, finding the other-crimes evidence was admissible under section 115-7.3 of the Code of Criminal Procedures of 1963 (725 ILCS 5/115-7.3 (West 2022)). The court found the two incidents occurred within a close proximity of time and were factually similar, as they both involved the sexual assault of two middle-aged, white Hispanic women on the same hospital floor and in vulnerable positions. Both acts were also committed under the pretext of cleaning the victims. Further, the court found relevant that the incidents weren't isolated, that defendant didn't know the victims, and that they didn't know each other.

---

[1] A separate case was pending regarding the incident (22 CR 4388), in which defendant was charged with aggravated criminal sexual assault and aggravated criminal sexual abuse.

¶ 7    The State also filed a motion *in limine* requesting in part that defendant be prohibited from cross-examining D.C. regarding her possible substance abuse, mental health, or psychiatric history. In court, defendant argued the subject matter would be relevant to D.C.'s credibility, as she had a history of heroin addiction, experienced withdrawals in the hospital, and was off her psychiatric medication "at the time." The court granted the State's motion.

¶ 8    Defendant filed a motion *in limine* to bar D.C.'s in-court identification of him. Defendant asserted the identification would be highly prejudicial with little probative value, as D.C. previously identified another individual as the offender. The court denied the motion, finding D.C.'s misidentification went toward the weight of her in-court identification, not its admissibility.

¶ 9    Prior to trial, the case was assigned to a new trial judge. Defendant waived his right to a jury trial and proceeded by bench trial.

¶ 10                                   B. Trial

¶ 11                              1. The State's Witnesses

¶ 12    M.B. testified she was taken to St. Anthony on January 18, 2022, due to respiratory issues and chest pain. She was placed in a room on the hospital's third floor and, due to her condition, couldn't go to the bathroom or bathe herself. Nurse Sonja Sorensen cared for M.B. on admission, and multiple PCTs cared for her throughout her stay. On January 25, 2022, M.B. felt "[t]errible" and her room was "burning hot." She was hooked up to an IV and received oxygen through tubes. Defendant, whom M.B. identified in court, entered her room three times that day.

¶ 13    On the first occasion, around 1 p.m., defendant entered her room wearing blue hospital scrubs and a mask. He introduced himself as Kevin, gave M.B. a "dirty look," jerked her arm, and took her blood pressure. On the second occasion, M.B. had urinated and defecated in bed. M.B.

pushed a call button, and defendant entered two hours later, around 3 p.m. Defendant wore his scrubs, a cap, gloves, and a yellow protective gown. He rolled M.B. over, pulled the blankets off her bed, wiped her down with washcloths, and then washed her "parts" with his gloved hands. M.B. felt defendant's erect penis against her butt through defendant's clothes three times.

¶ 14    On the third occasion, M.B. had defecated in bed again. She pressed the call button and waited about an hour until defendant arrived wearing the same hospital apparel with gloves and a mask. Defendant pulled M.B. to the side of the bed, took off his protective gown and mask, and cleaned M.B.'s vagina and anus with his gloved hands. M.B. felt uncomfortable. Defendant then inserted his erect penis into her anus and inserted three fingers in her vagina. M.B. pulled away, but defendant pulled her back toward him. His penis contacted her vaginal opening and almost entered her vagina. M.B. pulled away again. Defendant then moved toward the end of the bed, masturbated within a foot of her head, ejaculated into his gloved hand, and left. Throughout the incident, M.B. had been pressing the call button but no one responded.

¶ 15    M.B. didn't report the incident that day because she was in shock and couldn't talk. The next day, on January 26, 2022, Sorensen saw her crying and asked what happened. M.B. told her what happened and described defendant as a "large black male" wearing scrubs. She then reported the incident to police. She was found to have a bacterial infection in her vagina that she didn't have prior to her hospital admission.

¶ 16    Sorensen testified that she had worked with defendant at St. Anthony for a few months, and defendant was assigned to her unit. Typically, a room at St. Anthony was assigned one nurse and one PCT, and a unit would have two PCTs on any given shift. Torres was the PCT assigned to M.B.'s room, and defendant and Torres were the two PCTs working the unit on that shift. On

January 26, 2022, M.B. described the offender to Sorensen as a "large black male" wearing gray scrubs, although M.B. had denied during her testimony that she specified his scrubs were gray. Sorensen testified that defendant matched M.B.'s description because he was the only man working the unit and PCTs wore light gray scrubs.

¶ 17    Megan Madden, who worked as St. Anthony Hospital's risk manager, testified that on January 26, 2022, a patient experience manager reported a conversation she had with M.B. Madden received a description of a "heavyset African-American man wearing glasses." After an investigation, they determined defendant was working on M.B.'s floor and matched the description.

¶ 18    On January 27, 2022, Chicago police detective Michelle Krofta had a phone conversation with M.B. and then gave Madden the description of a "male black, heavyset, around 300 pounds, and wear[ing] glasses." On cross, Krofta confirmed that, on January 27 and February 1, M.B. told Krofta that she pressed the call button to summon the nurse after the incident, and the offender left the room. M.B. stated that Sorensen arrived, and M.B. told her what happened. During another interview between Krofta and M.B. on February 8, 2022, M.B. stated she reported the incident to Sorensen on January 26.

¶ 19    On February 1, 2022, Chicago police detective Daniel Fava administered the photo array for M.B. When M.B. saw the array, she began to cry and her hands shook. "Not long" after, she identified defendant as the offender in a "very direct" manner. M.B. had testified that she circled defendant's picture "right away."

¶ 20    Before the State called D.C., defense counsel asked the court to reconsider its ruling regarding his cross-examination of D.C. about her opioid addiction. The State acknowledged

evidence that D.C. had used heroin two days prior to her hospital admission but asserted there was no evidence it affected her during the incident. The court modified its ruling and stated counsel could ask whether D.C. was "under the influence of any kind of narcotic or alcohol at the time of the incident," and whether D.C. was "being treated for any addiction at that time." If D.C. responded "no," that would be "the end of the inquiry," but if the answers were "yes," counsel could inquire further because it would impact D.C.'s credibility.

¶ 21    D.C. testified that on January 10, 2022, she was taken to St. Anthony due to respiratory problems. On the morning of January 18, she was in her hospital bed and needed to be changed and cleaned. Defendant entered the room. D.C. hadn't encountered him before and didn't then know his name but identified him in court. His hair was short, and he wore glasses, a mask, an Apple watch, light gray scrubs, and a yellow gown. Defendant removed D.C.'s gown and diaper and told her to turn over and not look at him. He forced D.C.'s body toward him, inserted his fingers into her vagina, and "twirl[ed]" his fingers inside. He then pressed against D.C. so that she felt his penis against her butt through his scrubs. D.C. climaxed and said "that's enough." Defendant rubbed lotion on her buttocks before leaving.

¶ 22    D.C. pressed the call button. Defendant returned to the room and saw her crying. When D.C. said she wanted to go home, defendant walked back out. Eventually, D.C. signed herself out against medical advice. Outside her room, she saw defendant and a transportation person. Defendant repeatedly said he'd take D.C. downstairs, but D.C. insisted that the transportation person do it. Once downstairs, D.C. waited until her husband picked her up. On January 19, 2022, D.C. reported the incident to a nurse over the phone and went to the University of Illinois Chicago

emergency room, where she described the offender to a nurse as "light skin, black male, approximately 21 to 30, 5'6" at 170 pounds."

¶ 23    On February 1, 2022, detectives showed D.C. a photo array. She told them she couldn't identify the offender because none of the depicted individuals wore glasses, and "a lot" of them looked older. She repeatedly told the detectives that one person looked like the offender but didn't have glasses. D.C. didn't think the actual offender was in the array but ultimately circled someone, whom she told the detectives was skinnier and didn't have a beard, unlike defendant.

¶ 24    On cross, D.C. confirmed she couldn't breathe or walk and was dizzy when admitted to the hospital, but she wasn't "completely out of it." She didn't receive her "depression pills" at the hospital but was given medication through an IV. She didn't know the medication she received, but it didn't make her dizzy or faint. Defense counsel asked D.C. if she was treated for heroin withdrawal and then confirmed with the court he was asking about treatment on January 10, the date of D.C.'s admission. The court sustained the objection "as to on January 10th" but allowed counsel to rephrase the question. Counsel then asked D.C. if she was treated for heroin withdrawal at the hospital, and she stated, "No." He asked if D.C. used heroin prior to admission, and the court sustained the State's objection to the question.

¶ 25                                    2. Defendant's Witnesses

¶ 26    Defendant testified that he started working at St. Anthony on October 24, 2021. He denied that he was assigned to or entered M.B.'s room on January 25, 2022, and denied that he committed the alleged acts of sexual assault against M.B. He also denied contacting M.B. that day, taking her vitals, or cleaning her backside and vaginal area, as "she wasn't [his] patient." He acknowledged being assigned to D.C.'s room on January 18, 2022, and taking her vitals, but denied cleaning her

because she was "very capable of doing everything on her own." He also denied inserting his fingers in D.C.'s vagina.

¶ 27    On cross, defendant confirmed he was the only male PCT working on January 18 and 25, and that he wore glasses and light gray scrubs working there. When working with COVID-19-positive patients, he had to wear a mask, hair covering, and gown. He gave patients baths as needed, which included "cleaning private areas." On January 28, 2022, he participated in an internal investigation regarding the allegations in M.B.'s case and gave his account in a phone interview with Madden and two others. He didn't recall saying he was assigned to M.B.'s room. Defendant spoke to detectives on March 21, 2022, after his arrest. He told them M.B.'s room was hot on January 25 but denied telling them he entered M.B.'s room three times or cared for a patient in that room. He also told the detectives he was aware of D.C.'s allegations, but not M.B.'s. Defendant recognized D.C. in court but denied having ever seen M.B. before. He also confirmed that a photograph of him showed him wearing an Apple watch.

¶ 28    Alicia Torres testified that she and defendant were the two PCTs assigned to the third floor on January 25, 2022. Defendant was the only male PCT assigned there. Torres was the PCT assigned to M.B.'s room that day, and defendant was assigned to the room across the hall. That day, M.B. was "up and moving" and "doing very well." Torres checked on her every hour and responded to M.B.'s calls within a few minutes. The temperature in M.B.'s room was "maybe 72." At one point, Torres took a break and told Sorensen, but not defendant. She generally took the same breaks every day at 9:30 a.m. and 1:30 p.m., and other PCTs helped her patients when she was unavailable. She didn't see defendant enter M.B.'s room, but acknowledged she didn't watch the door to M.B.'s room for a "good part of the day."

¶ 29    Nurse Graciela Castanon testified that she didn't see M.B. at St. Anthony on January 25. On cross, she stated she spoke with M.B. on January 26, who was crying and gave the description of "a young African-American male in light blue scrubs weighing about 300 pounds with glasses." Nurse Josefina Garcia testified that she was assigned to M.B.'s room at St. Anthony during a night shift on January 25. M.B. could walk and use the bathroom, didn't appear upset, and didn't mention being assaulted.

¶ 30                                3. State's Rebuttal

¶ 31    The State called in rebuttal Chicago police detective Jacqueline Kinsella, who testified that she and Detective Krofta interviewed defendant on March 21, 2022. D.C.'s name never came up during the interview.

¶ 32                                C. Conviction

¶ 33    The trial court found defendant guilty of three counts of aggravated criminal sexual assault (counts II, IV, and V of the indictment). The court found M.B. credible and "largely unimpeached" despite "substantial cross-examination." The court also found defendant not credible, as defendant knew M.B. was the complainant, lied to hospital personnel and police, and made inconsistent statements regarding whether he was assigned to M.B.'s room. The court stated it was "not considering the testimony from [D.C.] as it pertains to propensity."

¶ 34    Defendant filed a posttrial motion, which alleged in part that the court erred in granting the State's motion to admit other-crimes evidence, allowing D.C. to identify him in court, and prohibiting him from cross-examining D.C. regarding her opioid withdrawal and mental health history. The court denied the motion, stating in part, "I want to be clear that the Court did not consider the testimony of [D.C.] as I mentioned in my ruling on February 8th."

¶ 35    The court sentenced defendant to three consecutive sentences of six years in prison for each count of aggravated criminal sexual assault, and ordered defendant to register as a lifetime sex offender.

¶ 36                                    II. ANALYSIS

¶ 37                          A. Sufficiency of the Evidence

¶ 38    Defendant appears to raise a challenge to the sufficiency of the evidence presented at trial.[2] He asserts that the evidence was not sufficient to prove him guilty of aggravated criminal sexual assault beyond a reasonable doubt because the State relied "almost entirely on the inconsistent and uncorroborated testimony of M.B., whose account was contradicted by multiple hospital staff members on key points."

¶ 39    When reviewing a challenge to the sufficiency of the evidence, our question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It's the responsibility of the trier of fact to "resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Sauls*, 2022 IL 127732, ¶ 52. We will not substitute our judgment for that of the trier of fact on issues involving the weight of the evidence or credibility of witnesses. *People v. Siguenza-Brito*, 235 Ill. 2d 213,

----

[2]Defendant's opening brief contains a section titled "Manifest Weight of the Evidence," which asserts that the "trial court's guilty finding was against the manifest weight of the evidence" given the "serious doubts raised by the evidence as a whole." Defendant essentially asserts that the State failed to satisfy the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), as he contends that "even when viewing the evidence in the light most favorable to the State, no rational factfinder could have found the Defendant guilty beyond a reasonable doubt." We interpret this argument to be a challenge to the sufficiency of the evidence, brought under the *Jackson* standard.

224-25 (2009). "[C]ontradictory testimony does not necessarily destroy the credibility of a witness," and we won't reverse a conviction simply because the evidence is contradictory or because the defendant claims a witness wasn't credible. *People v. Gray*, 2017 IL 120958, ¶¶ 36, 47.

¶ 40    Here, defendant was found guilty of three counts of aggravated criminal sexual assault. A person commits criminal sexual assault by committing an act of sexual penetration and using force or threat of force. 720 ILCS 5/11-1.20(a)(1) (West 2022). Section 11-1.30(a)(4) states that a person commits aggravated criminal sexual assault by committing criminal sexual assault and, during the commission of the offense, commits another felony. 720 ILCS 5/11-1.30(a)(4) (West 2022). In this case, the other felony is another act of criminal sexual assault.

¶ 41    Defendant argues that the State failed to prove his identity and challenges the reliability of the identifications made by M.B. and D.C. We note that the trial court expressly stated it didn't consider D.C.'s testimony. Nonetheless, M.B.'s identification alone was sufficient to sustain defendant's conviction, as she testified competently and was corroborated by other testimony.

¶ 42    It is well-settled that a valid conviction may be based on a positive identification by a single eyewitness who had ample opportunity to observe. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 22. When assessing the reliability of identification testimony, Illinois courts apply the factors set forth in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972): (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007). We apply the *Biggers* factors where, as here, a

defendant asserts the evidence was not sufficient to prove his identity. See, *e.g.*, *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989). We find each factor weighs in favor of M.B.'s identification being sufficient and reliable to sustain defendant's conviction.

¶ 43    First, M.B. had ample time to view defendant, as he entered her room three times and spoke with her. He came within close proximity to M.B. each time and, on the third occasion, had removed his mask before masturbating within a foot of her head. M.B.'s close proximity in an enclosed hospital room on multiple occasions weighs in favor of her identification being sufficiently reliable. See *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40 (inquiry is whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation); see also *People v. Wehrwein*, 190 Ill. App. 3d 35, 39 (1989) (adequate opportunity to view the offender is the most important factor).

¶ 44    Second, there's no indication that M.B.'s degree of attention was compromised or that she wasn't fully conscious during the incident. Rather, M.B. gave a detailed account of the incident, as well as defendant's physical features and clothing. See *People v. Blankenship*, 2019 IL App (1st) 171494, ¶ 29 (witness' "detailed account" of the incident indicated attentiveness). As to the third factor, M.B. consistently described defendant as male, black, heavyset, and wearing glasses and scrubs. According to a nurse called by defendant, M.B. even estimated defendant weighed about 300 pounds, consistent with indications in the record that defendant weighed 260 pounds. See *People v. Davila*, 2022 IL App (1st) 190882, ¶ 40 (identification reliable where a victim accurately described several specific characteristics of the defendant).

¶ 45    As to the fourth and fifth *Biggers* factors, M.B. displayed a high degree of certainty in identifying defendant from a photo array only one week after the incident. When detectives

presented M.B. with a photo array, M.B. began crying and "[n]ot long after" circled defendant's picture in a "very direct" manner. See *People v. Johnson*, 2024 IL App (1st) 220494, ¶ 53 ("Though the continued validity of [the degree of certainty factor] has been challenged, it remains relevant."); see also *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 32 ("recent research" has concluded that "expressions of certainty at the time of initial identification are a relevant indicator of accuracy"). Moreover, M.B.'s identification of defendant took place on February 1, 2022, just one week after the January 25, 2022, incident. Courts have found significantly longer lengths of time did not render identifications unreliable. See, *e.g.*, *People v. Green*, 2017 IL App (1st) 152513, ¶ 113 (three months between the crime and the identification); *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (one year and four months).

¶ 46    We further note that M.B.'s identification was also corroborated by other witnesses' testimony. The multiple hospital staff members called by both parties testified in agreement that defendant was the only male PCT working on M.B.'s floor at that time. St. Anthony risk manager Madden also testified that defendant matched M.B.'s description of the offender. Defendant himself even acknowledged he was the only male PCT working on the date of the incident.

¶ 47    Defendant, however, argues on appeal that M.B.'s identification was unreliable because she was contradicted by other witnesses as to whether she was completely immobile during the incident and whether her room was hot. He also asserts that M.B. gave inconsistent accounts regarding when she first made her outcry to hospital staff about the assault. Yet none of these minor discrepancies necessarily create a reasonable doubt of defendant's guilt. See *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85 ("Minor inconsistencies in the testimony between witnesses or within one witness's testimony may affect the weight of the evidence but do not

automatically create a reasonable doubt of guilt."). It was the role of the trier of fact to evaluate M.B.'s credibility, and we will not substitute our judgment for the trial court's, as defendant asks us to do. *Siguenza-Brito*, 235 Ill. 2d at 224-25. Viewing the evidence as a whole, and in the light most favorable to the State, we cannot find the evidence was "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Bradford*, 2016 IL 118674, ¶ 12.

¶ 48    We also note that defendant argues the trial court couldn't have found him guilty based on the alleged unreliability of D.C.'s identification of him as the offender. Yet the court expressly stated, two times on the record, that it did not consider D.C.'s testimony. Regardless of the reliability of D.C.'s testimony as to a separate incident of sexual assault, as we have stated, M.B.'s identification of defendant alone was sufficient to sustain the finding that defendant committed the sexual assault against M.B. See *Macklin*, 2019 IL App (1st) 161165, ¶ 22.

¶ 49                    B. Admissibility of D.C.'s In-Court Identification

¶ 50    Defendant also argues the trial court abused its discretion in admitting D.C.'s in-court identification of him. Citing the *Biggers* factors, he asserts the identification was inadmissible because it was unreliable, as D.C. identified another person as the offender prior to trial.

¶ 51    We again turn to the *Biggers* factors. See *Piatkowski*, 225 Ill. 2d at 567; see also *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 89 (applying *Biggers* factors in other crimes context). In doing so, we will not reverse the trial court's ruling on the admissibility of evidence absent an abuse of discretion. *People v. Calderon*, 369 Ill. App. 3d 221, 231 (2006).

¶ 52    We find the first three *Biggers* factors favor the State, namely, D.C.'s opportunity to observe defendant, her degree of attention, and the accuracy of her description. As was the case

with M.B.'s testimony, D.C.'s testimony showed D.C. had ample opportunity to observe defendant, not only while being in close quarters with defendant during the assault but also when he confronted her outside her hospital room. *Tomei*, 2013 IL App (1st) 112632, ¶ 40 (*supra* ¶ 43). Also like M.B.'s testimony, D.C. provided a detailed account of defendant's appearance and what he was wearing, recalling that he wore glasses and an Apple watch, which was corroborated by photographs of defendant entered into evidence. See *Blankenship*, 2019 IL App (1st) 171494, ¶ 29 (*supra* ¶ 44). While D.C.'s numerical estimation of defendant's weight was inaccurate, she also described him as having a "very heavy build," and her description of defendant was mostly accurate and consistent with the remainder of the record.[3] See *In re N.A.*, 2018 IL App (1st) 181332, ¶ 28 (victim not required to describe the offender "with pinpoint accuracy").

¶ 53    Defendant emphasizes that D.C. identified another person as the offender prior to trial, which would be relevant to the last two *Biggers* factors, *i.e.*, time between the incident and the confrontation, and the degree of certainty. Yet D.C. testified that she told detectives she couldn't identify defendant because she didn't see him wearing glasses in the array as he did during the incident. D.C. even told the detectives that she didn't believe the person she identified was actually the offender. In other words, D.C.'s misidentification was apparently based on her expressed concern that the photos in the array didn't exactly match her (essentially accurate) description of defendant. Given that D.C. stated she knew she wasn't identifying the correct person and otherwise accurately described defendant, we cannot find D.C.'s pretrial misidentification renders D.C.'s in-court identification so unreliable that it was inadmissible. Rather, her inability to identify defendant

---

[3] As we have stated, D.C. described defendant to a nurse as "light skin, black male, approximately 21 to 30, 5'6" at 170 pounds." The record reflects that defendant was black, male, about 30 years old at the time of the incident, 5 feet 9 inches, and weighed 260 pounds.

would go toward the weight to give her identification. See *Calderon*, 369 Ill. App. 3d at 232 (witness' inability to identify a defendant prior to trial does not render incompetent and inadmissible the witness' later identification at trial); see also *People v. Maloney*, 201 Ill. App. 3d 599, 609 (1990) (same). Thus, we cannot find the court abused its discretion in allowing D.C. to identify defendant in court.

¶ 54          C. Admissibility of D.C.'s Testimony as Other-Crimes Evidence

¶ 55    Defendant also asserts the trial court erred in admitting D.C.'s testimony as other-crimes evidence. Specifically, he argues there was little evidence connecting him to the crime committed against D.C., and the court couldn't have admitted the other-crimes evidence without first making a finding regarding D.C.'s identification of defendant. Defendant also argues that, because there was no pretrial identification of defendant as the offender in D.C.'s case, the two sets of allegations were too dissimilar for the other-crimes evidence to be admitted.

¶ 56    Evidence of other crimes is generally inadmissible "if it is relevant only to show the defendant's propensity to engage in criminal activity." *People v. Rios*, 2022 IL App (1st) 171509, ¶ 64. Section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2022)), however, allows the use of other-crimes evidence where the defendant is accused of sex offenses, including, as here, aggravated criminal sexual assault. *Id.* § 115-7.3(a), (b); *People v. Kline*, 2024 IL App (1st) 221595, ¶ 79 (115-7.3 allows other-crimes evidence to demonstrate propensity to commit sex offenses). In such an instance, evidence that the defendant committed another offense, here the aggravated criminal sexual assault of D.C., is admissible and "may be considered for its bearing on any matter to which it is relevant," including propensity. *Id.* § 115-

7.3(b). Other-crimes evidence is also admissible when it is relevant to show identity or bolster a victim's identification of the perpetrator. *People v. Johnson*, 368 Ill. App. 3d 1146, 1158 (2006).

¶ 57   Prior to admitting other-crimes evidence under section 115-7.3, the trial court must weigh the probative value of the evidence against the undue prejudice to the defendant. *Kline*, 2024 IL App (1st) 221595, ¶ 79. This involves an inquiry codified in section 115-7.3(c), which provides that the court must consider (1) "the proximity in time to the charged or predicate offense"; (2) "the degree of factual similarity to the charged or predicate offense"; or (3) "other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2022). For other-crimes evidence to be admissible, the State's proof of the other crime "need not be beyond a reasonable doubt but must be more than a mere suspicion." (Internal quotation marks omitted.) *People v. Rosado*, 2017 IL App (1st) 143741, ¶ 22. We review this issue for abuse of discretion. *Id.* ¶ 19.

¶ 58   We find the trial court did not abuse its discretion in admitting evidence of the aggravated criminal sexual assault of D.C. First, the "other crime" in question was exceptionally close in time to the instant crime, as the two occurred within a week of each other. See *Johnson*, 2020 IL App (1st) 162332, ¶ 42 (proximity factor "clearly satisfied" where two incidents occurred within 12 days of each other). Second, the two crimes were undeniably similar, as they both involved defendant sexually assaulting a female patient in a vulnerable state, on the same floor of the same hospital, under the pretext of cleaning them. *People v. Ramsey*, 2017 IL App (1st) 160977, ¶ 32 ("As factual similarities increase, so does the relevance, or probative value, of the other-crimes evidence." (Internal quotation marks omitted.)). As to the third 115-7.3(c) factor, the court additionally found relevant that defendant didn't know both victims. See *Kline*, 2024 IL App (1st)

221595, ¶ 80 (victim's relationship to the defendant relevant to 115-7.3(c) inquiry, where one victim was a sex worker and the other was in a long-term relationship with the defendant).

¶ 59    Nonetheless, defendant asserts that, prior to conducting a 115-7.3(c) inquiry, the court was required to first find that D.C.'s identification of defendant as the offender was reliable. He contends that the failure to do so "switch[ed]" the burden of proof onto him, forcing him to prove the other crime was committed by someone else. Yet defendant's argument assumes that the State had the initial burden to prove defendant committed the other crime for the other-crimes evidence to be admissible. This court has made clear that the State need only show more than a "mere suspicion" for other-crimes evidence to be admissible. *Rosado*, 2017 IL App (1st) 143741, ¶ 22. Here, the evidence far exceeded that standard, regardless of whether D.C. reliably identified defendant, as both crimes here were committed within a week of each other, on the same floor of the same hospital, and by a man with the same description. See *Johnson*, 368 Ill. App. 3d at 1152-53, 1159 (evidence of multiple other crimes was admissible despite lack of identification in the other crimes, where the same gun was used in both the crime at issue and one other crime, and the defendant matched the description given in another one of the "other" crimes). Given that the factors set forth in section 115-7.3(c) overwhelmingly favored the admissibility of the other-crimes evidence, we cannot find the court erred in admitting D.C.'s testimony as other-crimes evidence. See 725 ILCS 5/115-7.3(c) (West 2022).

¶ 60                    D. Limitations on D.C.'s Cross-Examination

¶ 61    Finally, defendant asserts that the trial court erred in prohibiting defendant from cross-examining D.C. regarding her substance abuse history and mental health condition at the time of the offense.

¶ 62    Criminal defendants have the right under the sixth amendment to cross-examine witnesses against them. U.S. Const., amend VI. It is within the trial court's sound discretion, however, to limit the scope of cross-examination and determine the extent of cross-examination with respect to an appropriate subject. *People v. Sanders*, 2019 IL App (1st) 160718, ¶¶ 22-23. A witness' drug use or mental health history can be proper subjects for cross-examination, as they may be relevant as they relate to a witness' credibility. See *People v. Carter*, 2022 IL App (1st) 210261, ¶ 96 (drug use); *People v. Johnson*, 2023 IL App (2d) 210110, ¶ 30 (mental health). To introduce this evidence, however, counsel must first establish the relevance of the topics to the witness' credibility. *Baldwin*, 2014 IL App (1st) 121725, ¶ 52. We will not disturb the trial court's decision to limit the scope of cross-examination absent an abuse of discretion. *Id.* ¶ 22.

¶ 63    Here, defendant asked that the court permit him to cross-examine D.C. as to her mental health and drug usage. The court ultimately allowed defendant to cross-examine D.C. as to her state of mind and whether she was under the influence or withdrawing from an influence during the incident, as it related to her ability to recall what occurred. Yet the court prohibited defendant from cross-examining D.C. regarding her mental condition and drug usage generally. We find the trial court exercised proper discretion in limiting the cross-examination, as inquiry regarding D.C.'s general history of substance abuse and mental health would not have been relevant as to whether D.C. was able to observe and recall the events she was testifying about. See *Johnson*, 2023 IL App (2d) 210110, ¶ 31 (trial court properly limited questioning of witness regarding her mental health to which medications she was prescribed and whether she was diagnosed with a mental illness " 'that would affect her ability to perceive the facts as they were occurring' ").

¶ 64    We also note that D.C.'s testimony was only offered as other-crimes evidence. This court has cautioned that other-crimes evidence "must not become the focal point of the trial," and the trial court "should prevent a mini-trial of a collateral offense." (Internal quotation marks omitted.) *Johnson*, 2020 IL App (1st) 162332, ¶ 52. Allowing extensive cross-examination D.C.'s history of substance abuse, medication, and mental health would have risked making the State's other-crimes evidence a focal point of the trial. We find no abuse of discretion occurred in limiting this line of inquiry, where it would not have been relevant to the central issue at trial, *i.e.*, whether defendant committed the aggravated criminal sexual assault of M.B. See Ill. R. Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

¶ 65                                E. Harmless Error and Cumulative Error

¶ 66    We find that the trial court committed no error in admitting D.C.'s testimony and in-court identification of defendant, or in limiting defendant's cross-examination of D.C. Nonetheless, even had any errors occurred regarding D.C.'s testimony, they could not possibly merit reversal as they would be harmless. As recounted, the trial court stated twice, both in announcing its finding of guilt and in denying defendant's posttrial motion, that it did not consider D.C.'s testimony. Thus, the record clearly shows that any potential error during D.C.'s testimony could not have contributed to defendant's conviction. See *People v. Cox*, 2023 IL App (1st) 170761, ¶ 56 (The critical question under harmless error analysis is "whether it appears beyond a reasonable doubt that the error did not contribute to the verdict." (Internal quotation marks omitted.)). Having

rejected defendant's claims of error, we need not address his argument that cumulative error denied him a fair trial. See *People v. Peterson*, 2017 IL 120331, ¶ 131.

¶ 67                                    III. CONCLUSION

¶ 68    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 69    Affirmed.